**F. BUDDIE CONTRACTING, INC., Plaintiff,**

v.

**William SEAWRIGHT, et al., Defendants.**

No. C80–2344.

United States District Court, N.D. Ohio, E.D.

Aug. 15, 1984.

Frank B. Moore, Rocky River, Ohio, Matthew A. Zidar, Cleveland, Ohio, for plaintiff.

Larry Gordon, Wm. Tousley Smith, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION

DOWD, District Judge.

Before the Court is the motion for summary judgment of defendant, Peabody Galion, Inc., (Peabody). For the reasons stated below, the motion for summary judgment is denied.

## I. FACTUAL BACKGROUND

This case arose out of the award of a contract to build a solid waste transfer station (transfer station) for the City of Cleveland (City) in May 1975. The City retained Seminole Management Consultants, Inc., (Seminole) to prepare the specifications for the transfer station and to assist the City in reviewing bids for the project. Seminole's president, Lawrence Plants (Plants), was principally responsible for this work. F. Buddie Contracting, Inc. (Buddie), the plaintiff in this action, was one of the bidders on the project. Peabody, through one of its local distributors, William Seawright (Seawright), also bid on the project.

A number of companies bid for the transfer station contract. In relevant part, those bids were

| | |
|---|---|
| Buddie Contracting, Inc. | $1,247,700.00 |
| Stephens Paint & Corp. | 1,472,000.00 |
| Peabody-Galion | 1,578,766.00 |

A review of the bids, however, indicates that the bidders found the specifications ambiguous and bid on slightly different projects. The City then turned to its consultant, Seminole, to review the bids and to make a recommendation for the award of the contract. Seminole recommended that the City award the contract to Peabody as the lowest responsible bidder and that the City disqualify Buddie's bid as defective. Acting on Seminole's recommendation, the City then awarded the contract to Peabody on June 20, 1975.

On July 9, 1975, Buddie filed a taxpayer's action in Cuyahoga County Common Pleas Court (Buddie I) alleging a violation of the state laws regulating the award of public contracts. Buddie sought an injunction barring execution of the contract and readvertisement of the bids. Within two weeks, the trial judge heard the case on plaintiff's application for a preliminary injunction.

On August 6, 1975, the trial judge entered judgment in favor of the defendants in the Buddie I action. In his opinion, the trial judge indicated that he had, apparently on his own motion, consolidated the trial on the merits with the application for preliminary injunction pursuant to Ohio Civil Rule 65(B)(2). In relevant part, the trial judge's opinion stated that he found no evidence of improper conduct or collusion involving any public official or bidder. He further found that Seminole was justified in suggesting rejection of Buddie's bid because of defects in the bid. In conclusion, the trial judge, recognizing the limited role of courts in reviewing awards of public contracts, upheld the selection of Peabody as the successful bidder.

Buddie appealed the decision of the Buddie I court to the Eighth District Court of Appeals. That Court affirmed the trial judge's decision in an opinion filed on December 2, 1976. Construction of the transfer station proceeded throughout this period and the transfer station is now complete.

Subsequent to the close of the Buddie I action, press revelations and a subsequent prosecution disclosed an unlawful relationship between Seminole and Peabody. Seminole's president, Plants was discovered to be a close business associate of defendant, Seawright, the president of a Peabody distributor. On December 21, 1978, the Cuyahoga County Grand Jury indicted Seawright, Seminole, and Plants on criminal charges arising out of their involvement in the award of the contract for the transfer station. Ultimately, Seawright pled guilty

to one count of attempt and complicity to have an unlawful interest in a public contract. Seminole pled guilty to one count of having an unlawful interest in a public contract and Plants pled guilty to attempt to have an unlawful interest in a public contract. The remaining counts of the indictment were dismissed as part of the plea bargain.

Frank John Gerdnic, vice president of marketing for Peabody's solid waste division, received a grant of immunity in exchange for his testimony in this case. His sworn statement, attached to the brief in opposition to the motion for summary judgment, indicates that Peabody had knowledge of Seawright's unlawful conduct and took no action to disassociate itself from Seawright.

## II. PROCEDURAL HISTORY

After the entry of the guilty pleas, Buddie instituted this federal court action alleging violations of the antitrust laws. In brief, Buddie alleges that the defendants conspired to secure the award of the contract for Peabody, even though Peabody was not the lowest responsible bidder. It claims that this conspiracy violated both § 1 of the Sherman Act, 15 U.S.C. § 1, and Ohio's Valentine Act, Ohio Rev.Code § 1331.01 *et seq.*

Peabody now moves for summary judgment arguing that (1) Buddie's cause of action is barred by the statute of limitations; (2) Buddie lacks standing to sue for damages under the antitrust laws; and (3) Buddie's allegations fail to state a violation of the antitrust laws. Even if Buddie's legal theories and factual submission survive these legal challenges, Peabody further contends that collateral estoppel prevents Buddie from establishing facts required to make out its cause of action.

■ Before turning to these specific challenges, the Court notes the unique standard which applies to the review of summary judgment motions in an antitrust case. Historically, the courts have been extremely reluctant to dispose of antitrust litigation on summary judgment motions. *See Poller v. Columbia Broadcasting System, Inc.* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). While that standard has been somewhat relaxed, *see First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 284–90, 88 S.Ct. 1575, 1590–93, 20 L.Ed.2d 569 (1968), summary judgment is still disfavored, particularly where factual issues remain subject to dispute. *See Smith v. Northern Michigan Hospitals, Inc.,* 703 F.2d 942 (6th Cir.1983). While it is debatable whether this attitude toward summary judgment applies to motions presenting principally legal issues, the Court approaches the motion mindful of the particular hazards associated with granting summary judgment in antitrust litigation.

## III. STATUTE OF LIMITATIONS

A four year statute of limitations applies to federal antitrust claims.[1] The contract award which gives rise to this lawsuit was made on June 20, 1975—over five years followed until the filing of the complaint in this case on December 19, 1980. Absent some tolling provision, therefore, Buddie's claim will be barred by the statute of limitations.

Buddie's complaint contains an allegation of fraudulent concealment which Buddie claims will result in a tolling of the statute of limitations.[2] The Sixth Circuit set out

---

**1.** In relevant part, the statute of limitations provides that

Any action to enforce any cause of action under ... this title shall be forever barred unless commenced within four years after the cause of action accrued.

15 U.S.C. § 15b.

**2.** In relevant part, the complaint alleges

Plaintiff had no knowledge of said antitrust violations as they affected the bidding process and the award, or of any facts which might have led to discovery thereof at any time prior to disclosures contained in Cleveland Press articles in 1977, which disclosed the business and personal relationships between the defendants. Defendants deceptively secured the appointment of defendants, SEMINOLE and PLANTS as management consultants to the

the requirements for a party alleging fraudulent concealment in *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389 (6th Cir.1975). In that case, the Court stated:

> Three elements must be pleaded in order to establish fraudulent concealment: (1) wrongful concealment of their actions by the defendant; (2) failure of the plaintiff to discover the operative facts or the basis of his cause of action within the limitations; and (3) plaintiff's due diligence until discovery of the facts.

*Id.* at 394 (citation omitted). Further, plaintiff must allege fraudulent concealment with specificity under Fed.R.Civ.P 9(b) and plaintiff bears the burden of proving fraudulent concealment. 523 F.2d at 394.

Before analyzing Buddie's claim of fraudulent concealment, it is important to recognize the effect of the procedural posture of this case on the analysis. Although plaintiff bears the burden of proof on the issue of fraudulent concealment, on a motion for summary judgment, this Court must only determine whether a genuine issue of material fact exists which justifies a trial. This Court must evaluate, therefore, whether Peabody's motion establishes the absence of a genuine issue regarding any of these elements required for plaintiff's claim of fraudulent concealment.

■ Peabody has challenged Buddie's claim of fraudulent concealment on the ground that it fails to contain any of the three elements required by *Dayco*. Upon review, this Court concludes that Peabody's motion has not demonstrated the absence of any genuine issue as to any of the elements of fraudulent concealment.

The motion to dismiss on this basis, therefore, is denied.

*A. Wrongful Concealment.*

Under the test set forth in *Dayco*, the first element of Buddie's claim of fraudulent concealment is "wrongful concealment of their actions by the defendants." In the most common situation, this requirement is met by evidence of "affirmative conduct upon the part of the defendant which would ... lead a reasonable person to believe that he did not have a claim for relief." *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978). A defendant engaged in land fraud, for example, might satisfy this requirement by forwarding documentation relating to the purchased land to the victim.

In this case, Buddie does not contend that Peabody engaged in any "affirmative conduct" after the date of the contract award. Rather, Buddie has raised a genuine issue as to the existence of a conspiracy before the award of the contract and Peabody's participation in that conspiracy. From these facts, Buddie argues that it has satisfied the requirement of showing wrongful concealment.

This case, therefore, raises the issue of whether a conspiracy, which by its nature is self-concealing, will serve as a substitute for affirmative conduct by the defendants in satisfying the requirement of wrongful concealment. While this issue has been the subject of significant judicial comment, particularly in the context of antitrust claims, neither counsel nor the Court have located a case where a court has accepted a fraudulent concealment claim based upon the presence of a self-concealing conspiracy.

City of Cleveland through the influence of defendant SEAWRIGHT, a close friend and business associate of defendant, PLANTS. SEAWRIGHT was at the same time a distributor for defendant, PEABODY GALION. Defendants, SEMINOLE and PLANTS, thereafter tailored the specifications which they recommended to the City of Cleveland to fit defendant PEABODY GALION'S equipment and, indeed, defendant, PEABODY GALION did, in fact, draft the specifications. For their roles in the award of this contract, defendants, SEMINOLE, SEAWRIGHT and PLANTS, were indicted by a Cuyahoga County Common Pleas Grand Jury and entered pleas of guilty—SEMINOLE to having an unlawful interest in a public contract; PLANTS to attempt and having an unlawful interest in a public contract; and SEAWRIGHT to attempt and complicity. As a result, plaintiff, by the exercise of due diligence, did not discover, and could not have discovered, the violations alleged herein prior to 1977.

Complaint at ¶ 17.

Those courts which have considered the issue as a theoretical matter, however, have arrived at inconsistent results. Compare *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248 (9th Cir.1978); *In re Fertilizer Antitrust Litigation*, 1979–2 Trade Cases ¶ 62,894 (E.D.Wash.1979); and *Hall v. E.I. DuPont DeNemours & Co.*, 312 F.Supp. 358 (E.D.N.Y.1970) (rejecting a self-concealing conspiracy theory) with *Ashland Oil Co. of California v. Union Oil Co. of California*, 567 F.2d 984 (TECA 1977) and *Chambers & Barber, Inc. v. General Adjustment Bureau*, 60 F.R.D. 455 (S.D.N.Y.1973) (accepting a self-concealing conspiracy theory).

In the absence of controlling authority, resolution of this issue requires a consideration of. the policies behind the statute of limitations and the fraudulent concealment exception. The Supreme Court's decision in *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 22 L.Ed. 636 (1874), the principal early formulation of the doctrine of fraudulent concealment, provides the starting point for this review. In *Bailey*, the Court rejected a statute of limitations defense to a claim by a trustee-in-bankruptcy that the debtor had transferred his assets to his wife's name to avoid the claims of his creditors. Analyzing the concept of fraudulent concealment in the context of the statute of limitations, the Court stated that statutes of limitations:

> were enacted to prevent frauds; to prevent parties from asserting rights after the lapse of time had destroyed or impaired the evidence which should show that such rights never existed, or had been satisfied, transferred, or extinguished, if they ever did exist. To hold that by concealing a fraud, *or by commiting a fraud in a manner that it concealed itself* until such time as the party commiting the fraud could plead the statute of limitations to protect it, to make the law which was designed to

prevent fraud the means by which it is made successful and secure.

*Id.* at 349 (emphasis added). Rejecting any distinction between the rule applicable in cases brought in law or in equity the Court went on to hold that

> when there has been no negligence or laches on the part of a plaintiff in coming to the knowledge of a fraud which is the foundation of the suit, and when the fraud has been concealed, *or is of such character as to conceal itself,* the statute does not begin to run until the fraud is discovered by, or becomes known to, the parties suing, or those in privity with him.

*Id.* at 349–50 (emphasis added). The *Bailey* Court, therefore, clearly indicated that it would accept a claim of self-concealing conspiracy as meeting the requirement of wrongful concealment.

The *Bailey* decision serves as the basis for the modern doctrine of fraudulent concealment in antitrust law.[3] More recently, in *Dayco*, the Sixth Circuit stated that the reason for tolling the statute of limitations was the plaintiff's ignorance of its claim because of the defendant's conduct. The statute of limitations exists for the purposes of barring stale conflicts. 523 F.2d at 394. While the statute allows the defendant to repose after the passage of time, this policy is subsidiary to the policy that the plaintiff should have some opportunity to litigate his claim.

■ It is in this context that the Court must consider Buddie's claim that a self-concealing conspiracy will substitute for affirmative conduct. The preceding analysis indicates that the doctrine of fraudulent concealment should be construed to give plaintiffs at least some opportunity to litigate claims which are not discovered because of the conduct of the defendants before the statute of limitations runs. While a conspiracy is self-concealing, the

---

**3.** For excellent discussions of the developing law of fraudulent concealment and the relationship of the *Bailey* decision to that development, *see* Note, "The Application of the Doctrine of Fraudulent Concealment to Modern Federal Trade Conspiracy Cases," 14 *Conn.L.Rev.* 115 (1981); Note, "Intent to Conceal: Tolling the Antitrust Statute of Limitations under the Fraudulent Concealment Doctrine," 64 *Geo.L.J.* 791 (1976).

plaintiff lacks the opportunity to bring the claim. A self-concealing conspiracy, therefore, is the logical equivalent of affirmative acts which conceal a potential plaintiff's claim. Upon this analysis, the Court concludes that a self-concealing conspiracy will suffice to meet the requirement of wrongful concealment.

The propriety of this is demonstrated by consideration of the anomalous results which would result from a contrary ruling. If a contrary result obtained, the law would reward people who entered into successful conspiracies. In an unsuccessfully concealed conspiracy, the participants must engage in·continuing conduct to keep their conspiratorial acts secret. This continuing conduct would constitute the wrongful concealment required by *Dayco* under any analysis. In a successfully concealed conspiracy, however, the conduct which takes place prior to the implementation of the conspiratorial plan is sufficient to keep the entire scheme secret; continuing conduct is not required. This Court can see no reason to distinguish between these two situations and finds they are equally prejudicial to plaintiffs' ability to discover and litigate their claims, the principal reason for the existence of a fraudulent concealment exception to the statute of limitations.[4]

The Court also rejects Peabody's contention that the legislative history of the antitrust statute of limitations requires a different result. Specifically, Congress rejected a formulation of the statute which would have provided that the statute began to run when the "plaintiff discovered" the facts relied upon for proof of its claim. The floor debates, however, indicate that Congress believed that the statute of limitations, as enacted, incorporated the rule enunciated in *Bailey*. The legislative history evidence, therefore, supports a conclusion that a self-concealing conspiracy will serve as a substitute for wrongful concealment. *See generally*, Note, 14 *Conn.L. Rev.* 116, 119–20 nn. 28–32.

■ Having concluded that the presence of a self-concealing conspiracy will serve as a substitute for wrongful concealment by the defendants, the Court must now turn to a consideration of the factual matters in this case. Buddie has raised a genuine issue of fact regarding the existence of the conspiracy based upon the record of the criminal prosecution of Plants, Seawright and Seminole. Further, Buddie has shown that the conspiracy was of the type that would be expected to conceal itself. The conspiracy remained secret through a prior state court judicial proceeding and for over two years thereafter, only coming to light after a journalistic investigation. Under these circumstances, the Court concludes that there are genuine issues of material fact surrounding Buddie's claim of wrongful concealment.

### B. *Buddie's lack of knowledge.*

The Court next turns to consideration of the second element of fraudulent conceal-

---

**4.** The best argument raised in opposition to acceptance of a self concealing conspiracy exception to the requirement of showing affirmative conduct appears in *Hall.* In that case, the court stated that

> It is in the nature of a conspiracy that there be secrecy; mere non-disclosure or denial of the existence of a conspiracy does not constitute fraud or deceit for tolling purposes. If it did, the tolling exception to the statute of limitation would eclipse the basic statute itself.

312 F.Supp. at 362. This Court does not agree with the *Hall* Court's analysis. A self-concealing conspiracy exception will not significantly affect the availability of a fraudulent concealment exception to the statute of limitations. Plaintiffs who claim fraudulent concealment must still demonstrate that they remained ignorant of the existence of the conspiracy and that they exercised due diligence in attempting to discover the conspiracy. These additional requirements will prevent the exception from overwhelming the rule as the *Hall* court feared.

Further, the federal antitrust statute of limitations relates to a range of potential antitrust claims beyond § 1 conspiracies. In those situations, where the existence of a conspiracy is not an issue with regards to merits of the claim, a self-concealing conspiracy theory might not apply. In the situation of a § 1 claim, however, a successful self-concealing conspiracy leaves plaintiff ignorant of one element of its cause of action. In contrast, in a monopolization claim, for example, the existence of a successful self-concealing conspiracy does not necessarily mean that plaintiff is ignorant of all the facts giving rise to its cause of action.

ment—failure of the plaintiff to discover the operative facts that are the basis of its cause of action. The parties in this case are in substantial agreement regarding the development of Buddie's knowledge of the facts underlying its claim. The issue for this Court to decide, therefore, is whether these facts fulfill the requirement that Buddie lacked knowledge of his claim.

Peabody asserts, and Buddie does not dispute, that at the time of the award of the contract in June, 1975, Buddie knew that (1) Peabody was awarded the contract without having the lowest monetary bid; (2) Seminole had used Peabody's specifications to draft the project specifications; (3) Peabody refused to quote equipment prices to any competitor; and (4) Seminole recommended Peabody over Buddie to the City.

Buddie also had "suspicions" as to the cause of these events. Regardless, Buddie has raised a genuine issue of fact regarding its awareness of the relationship between the defendants until the press revelations disclosed their relationship in 1977. Recognizing that "conspiracy" is an element of plaintiff's cause of action, and that a genuine issue of material fact exists as to Buddie's knowledge of the conspiracy, the issue remains whether Buddie may fulfill the lack of knowledge requirement where it had suspicions, but no proof, that a conspiracy existed in 1975.

The parties differ on the legal standard application of the resolution of this question. Peabody argues that "any fact that should excite his suspicion is the same as knowledge of his entire claim." *Wood v. Carpenter*, 11 Otto 135, 143, 101 U.S. 135, 143, 25 L.Ed. 807 (1879). That view has been somewhat eroded, however, particularly in the antitrust context and Buddie cites two relatively recent cases in which circuit courts have held that plaintiffs with suspicions, but no proof, of antitrust conspiracies were not barred from establishing their lack of knowledge.

In *In re Beef Antitrust Litigation*, 600 F.2d 1148 (5th Cir.1979), the Fifth Circuit confronted the lack of knowledge requirement in the context of an antitrust claim.

In that case, plaintiffs filed their action in 1975, relying on an allegation of fraudulent concealment to allow recovery of damages for the period preceding 1971. Defendants moved for summary judgment on the fraudulent concealment allegation arguing that plaintiffs had knowledge of their claim because of the filing of a similar lawsuit in 1968 by another plaintiff. In 1975, the plaintiffs in the other suit were awarded judgment. Nonetheless, the Fifth Circuit reversed the district court's grant of summary judgment to defendants on the availability of plaintiffs' fraudulent concealment claim despite finding that "the plaintiffs knew or should have known in 1968 and 1969 the allegations" of this complaint. The Court stated:

> The plaintiffs' knowledge of the [other] complaint, however, is not *as a matter of law* tantamount to actual or constructive knowledge of their claim.... The mere filing of a similar lawsuit, without more, does not necessarily give "good ground" because this suit might well be frivolous or baseless.

*Id.* at 1171. Under these circumstances, the Court concluded that the lack of knowledge issue should have been left for trial.

The Ninth Circuit reached a similar result in *Mt. Hood Stages, Inc. v. Greyhound Corp.*, 555 F.2d 687 (9th Cir.1977). In that case, a jury awarded the plaintiff damages for injuries covering the period from 1953 to 1973. As the suit was filed in 1968, plaintiff relied upon fraudulent concealment to toll the statute of limitations and allow recovery for a large portion of this period. Greyhound argued that Mt. Hood had knowledge of its claim because

> Mt. Hood's president expressed concern over Greyhound's expansion by acquiring other carriers, and that he also stated his belief that the consent decrees were being violated.

*Id.* at 698. Greyhound argued that these expressions indicated sufficient knowledge of Mt. Hood's claim to require Mt. Hood to initiate its own investigation. The Ninth Circuit rejected this view, stating that

in the face of Greyhound's assurances and denials of responsibility, we cannot say as a matter of law that Mt. Hood's awareness ... amounted to notice of potential antitrust claims against Greyhound.

*Id.* at 698–99. Knowledge of some of the facts giving rise to the claim, therefore, did not constitute knowledge of the claim under this analysis.

▆▆▆ These authorities stand for the proposition that, at least in antitrust cases, where a plaintiff remains ignorant of at least some of the facts required to make out its claim, the plaintiff does not have knowledge of its claim. In this case, Buddie lacked knowledge of the relationship between the defendants. That relationship is necessary to prove "conspiracy," an element of Buddie's antitrust claim. Without that knowledge, Buddie lacked knowledge of the antitrust claim, and therefore is not barred from establishing lack of knowledge.

### C. *Buddie's due diligence in investigating its claim.*

▆▆▆ The third element of fraudulent concealment which Buddie must establish is its due diligence in investigating the facts giving rise to its claim. *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir.1975). In this case, Buddie filed the Buddie I action in state court challenging the contract award. That suit did not include an antitrust claim and the discovery and trial of that suit did not disclose the defendants' relationship, the basis for the

conspiracy claim in this suit. The narrow issue for decision here, therefore, is whether Buddie may make out its allegation of due diligence despite its failure to uncover the conspiracy during Buddie I.

Upon review, this Court concludes that a genuine issue of material fact exists as to Buddie's due diligence in investigating its claims. The fact that Buddie failed to uncover the defendants' relationship does not, standing alone, demonstrate Buddie's failure to diligently pursue its claim. Buddie I was tried on an expedited basis; less than one month elapsed between the filing of the complaint and the Court's ruling on the merit. Further, it should be noted that the existence of such a relationship was not a major issue in Buddie I action. Under these circumstances, this Court finds that it would be improper to impose a requirement that Buddie uncover the conspiracy in that state court action.[5]

### D. *Conclusion*

Pursuant to this analysis, the Court finds that there are genuine issues of material fact regarding each element of the allegation of fraudulent concealment. Accordingly, the motion for summary judgment on this basis is denied.

### IV. ANTITRUST STANDING

▆▆▆ Peabody's next argument in support of its motion for summary judgment is that plaintiff's claim fails to allege "antitrust injury" or "antitrust standing" under the antitrust laws.[6] The core of Peabody's

---

**5.** The cases cited by Peabody, *Benoit v. Burlington Industries, Inc.*, 1975 Trade Cases ¶ 60,160 (S.D.N.Y.1975); and *Rutledge v. Boston Woven Hose and Rubber Co.*, 576 F.2d 248 (9th Cir. 1978), do not require the opposite result. While both cases involve the filing of a second antitrust lawsuit by a plaintiff arising out of a single transaction, both of these cases are distinguishable.

In *Benoit,* the Court found that all of the facts giving rise to the second lawsuit should have been discovered by plaintiff within the original period of limitations. There was no credible evidence, unlike this case, that plaintiff could have remained ignorant of its rights while exer-

cising due diligence in pursuing its claims in the first case.

*Rutledge* involved a second antitrust suit involving almost identical parties. In *Rutledge,* where a conspiracy was in issue in both antitrust claims, the Court rejected plaintiff's claims of due diligence when he failed to discover any conspiracy in the first action. In this case, however, conspiracy was not an element of the claims presented in the first lawsuit.

**6.** The terms antitrust injury and antitrust standing are used almost interchangeably in this area of the law. In essence, antitrust injury is the element which is added to traditional notions of standing to produce antitrust standing. For

contention is that while Buddie may have been damaged as a result of the transaction giving rise to this lawsuit, those injuries are not compensable under the antitrust laws. Analysis of Peabody's contention, therefore, requires consideration of the developing case law discussing antitrust standing.[7]

Section 4 of the Clayton Act, the provision authorizing private causes of action for antitrust violations, is also the statutory source for the developing doctrine of antitrust standing. In relevant part, that statute provides:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States....

15 U.S.C. § 15. A review of this statute does not suggest any intent to limit the scope of the antitrust laws. Regardless, the Courts have developed the doctrine of antitrust standing as a limitation on the availability of the § 4 remedy. The Court must now determine whether Buddie's claim falls within one of those limitations.

The concept of antitrust standing has undergone a significant evolution within the past decade. The Sixth Circuit and the Supreme Court have each issued three major rulings on the concept of antitrust standing during the past decade. The developing case law is summarized in *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079 (6th Cir.1983), and need not be repeated in this opinion.

Analysis of a plaintiff's antitrust standing consists of two related inquiries. The Court is required to determine whether the plaintiff has sustained injury-in-fact. If plaintiff satisfies this test, then the Court must analyze whether plaintiff's injury is of the type the antitrust laws were intended to prevent. The Court will separately analyze these two components of antitrust standing.

### A. *Injury-in-Fact.*

The early Sixth Circuit decisions on antitrust standing, *Malamud v. Sinclair Oil Corp.*, 521 F.2d 1142 (6th Cir.1975) and *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229 (6th Cir.1981), clearly indicated that injury-in-fact was part of the inquiry. The most recent Supreme Court and Sixth Circuit decisions have not contained any analysis of injury-in-fact. *See Associated General Contractors of California, Inc. (AGCC) v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), *Southaven Land Company v. Malone & Hyde, Inc.*, 715 F.2d 1079 (6th Cir.1983).[8] The indication from these decisions, however, is that the courts still consider injury-in-fact as part of the inquiry. The Supreme Court's distinction of antitrust standing from constitutional standing, *see AGCC*, 103 S.Ct. at 907 n. 31, clearly indicates that injury-in-fact must be presented to meet the constitutional standing requirement. Further, as a logical matter, the determination of whether there is injury-in-fact must pre-

---

ease of reference, the Court will phrase its discussion of these terms as "antitrust standing."

**7.** The term "antitrust standing" is distinct from traditional concepts of "standing." Recently, the Supreme Court discussed this distinction, stating:

> the label "antitrust standing" has traditionally been applied to some of the elements of this inquiry. As commentators have observed, the focus of the doctrine of "antitrust standing" is somewhat different from that of standing as a constitutional doctrine. Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the Court must make a further determina-

tion of whether the plaintiff is a proper party to bring a private antitrust action.

> *Associated General Contractors of California, Inc. v. California State Counsel of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983) (citation omitted).

**8.** The failure of the *McCready*, *AGCC*, and *Southaven* courts to discuss injury-in-fact does not remove this inquiry from the analysis. Those courts focused their attention upon the conceptually more difficult issues relating to the second part of the test. Under these circumstances, their failure to specifically address injury-in-fact is not significant.

cede the analysis of whether this injury is of the type which the antitrust laws were intended to prevent. The Court, therefore, believes that the analysis of Buddie's antitrust standing begins with inquiry into injury-in-fact.

Buddie's claim to injury-in-fact requires a finding that "but for" the allegedly unlawful conduct of the defendants, Buddie would have received the award of the construction contract for the treatment station.[9] Two obstacles loom in Buddie's path which must be surmounted before a finding of injury-in-fact can be made. First, the City's award of the contract to Peabody must be set aside. The possibility of setting that award aside, and the collateral estoppel effect of the Buddie I judgment upholding the award, are discussed later in this opinion in the context of collateral estoppel.

Even assuming that the award of the contract to Peabody may be vacated, the Court must then consider whether Buddie can prove that the City would have made the award to Buddie. Initially, Peabody argues that the City's retention of the option to reject all of the bids precludes the required finding that Buddie would have received the award. The facts in this case indicate that Buddie's bid was significantly lower than Peabody's and that Buddie envisioned a fairly similar completion date for the transfer station. With respect to this contention, therefore, the Court finds that Buddie has raised a genuine issue of material fact regarding whether the City would have exercised its option to reject the other bids if it could not award the contract to Peabody.

Alternatively, Peabody contends that the collateral estoppel effect of the Buddie I court's finding that Buddie's bid was defective precludes a finding that Buddie would have received the contract award. The Court will analyze this contention in the context of its discussion of collateral estoppel.

■ Under this analysis, if collateral estoppel does not preclude the fact finder from conducting a *de novo* review of the contract award,[10] the Court believes that Buddie has raised a genuine issue of fact regarding whether it would have received the award over Peabody's bid, and thus, has sustained injury-in-fact.

### B. *Proper Type of Injury.*

■ The recent decisions in *AGCC* and *Southaven* have begun to focus the inquiry for courts analyzing whether a potential antitrust plaintiff's injuries are of the type the antitrust laws were intended to prevent. Previously, the courts had considered this issue in the context of the directness of the injury or whether the interests the plaintiff was attempting to protect were within the target area of the antitrust laws. The parties in this case briefed the antitrust injury issue in view of those authorities.[11] With the decision in *AGCC*, however, that analysis is no longer relevant. *See Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 293 (2d Cir.1983).

In *AGCC*, the Supreme Court considered whether a carpenters' union had standing to raise an antitrust claim against a contractors' association which allegedly engaged in a conspiracy to direct construction

**9.** Buddie's claim of injury-in-fact also requires a finding that Buddie would have profited from receiving the contract award. As such, calculation of Buddie's damages will require at least some conjecture. The issue of whether this calculation is too speculative to support an award of damages, however, has not been raised in this context in the summary judgment motion. The Court, therefore, reserves decision on this issue.

**10.** Public contracting law generally limits a court's review of a contracting authority's

award to an abuse of discretion standard. Those cases, however, arise in a different factual context than this antitrust claim. Neither party has briefed the issue of the appropriate standard of review in the context of this summary judgment motion. The Court, therefore, reserves decision on this issue.

**11.** In fairness to the parties, the Court acknowledges that the summary judgment motions were briefed prior to the decisions in the *AGCC* and *Southaven* cases.

contracts to non-union firms. In that case, the Court reinstated the district court dismissal of the complaint as failing to state a claim under the antitrust laws because of a lack of antitrust standing. The Supreme Court relied upon common law concepts of "proximate cause" to define the appropriate types of injuries, 103 S.Ct. at 907–08, and proceeded to "identify factors that circumscribe and guide the exercise of judgment in deciding whether the law affords a remedy in specific circumstances." *Id.* at 908.

As noted by the *Southaven* court, the Supreme Court identified five factors in the *AGCC* decision which guide the exercise of the Court's judgment in deciding whether plaintiff's claim is the type of matter for which the antitrust laws were intended. Specifically, the Court ruled that it should look to:

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

715 F.2d at 1085 (citations omitted). As noted by the Sixth Circuit, however, it is unclear whether this list of factors is exhaustive or merely illustrative. *Id.* at 1086, n. 9. In any case, this Court will proceed to analyze Buddie's claim under the five factors identified in the *AGCC* and *Southaven* decisions.

### 1. *Causal Connection.*

· ▊ The first factor identified by the *Southaven* and *AGCC* courts is the "causal connection between the antitrust violation and harm to the plaintiff and whether

---

12. The relevant geographic and product markets are discussed later in this opinion. *See infra* at

that harm was intended to be caused." *Southaven,* 715 F.2d at 1085. Buddie has raised a genuine issue of fact regarding whether the alleged antitrust violation in this case resulted in the award of the contract to Peabody, not Buddie. As such, there is a close causal connection between the alleged violation and the injury claimed by Buddie. Moreover, if the defendants engaged in a conspiracy to divert the award from Buddie to Peabody, it can be inferred that they intended to cause the harm which Buddie sustained when it did not receive the contract award.

### 2. *Plaintiff's Status.*

The next inquiry focuses upon Buddie's status in the relevant market. As the Supreme Court stated in *AGCC,*

> As the legislative history shows, the Sherman Act was enacted to assure *customers* the benefits of price competition, and our prior cases have emphasized the central interest in protecting the economic freedom of *participants* in the *relevant market.*

103 S.Ct. at 908–09, (emphasis added). Under this authority, a proper antitrust plaintiff should be a "consumer, customer, competitor or participant in the relevant market or otherwise inextricably intertwined with any such entity." *Southaven,* 715 F.2d at 1087. In this case, Buddie satisfies this element of the test because of its status as a competitor of Peabody's.[12]

### 3. *Directness of the Injury.*

Although concepts of directness are difficult to apply, the *Southaven* court indicated that the presence of "highly speculative" damages is an indicator of indirectness. 715 F.2d at 1087. In this case, calculation of Buddie's damages from the loss of the contract award is necessarily speculative. In essence, this calculation requires the factfinder to determine how much profit Buddie would have made on the construction project if it had received the award.

437–438.

As Buddie did not construct the plant, this inquiry necessarily requires estimates of the costs Buddie would have incurred. Under this analysis, the Court believes that Buddie's damages are somewhat indirect and speculative, although the claim is not as speculative as the damage theory rejected by the *Southaven* court. *Id.* at 1087–1088.[13]

#### 4. *Potential For Duplicative Recovery.*

The concern with potential duplicative recovery derives from the Supreme Court's decision in *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). In that case, the Court expressed concern regarding the "risk of duplicative recovery engendered by allowing every person along a chain of distribution to claim damages arising from a single transaction that violated the antitrust laws." *Id.* at 474–75, 102 S.Ct. at 2546–47. In this case, there are only two realistic potential plaintiffs—Buddie and the City. As Plants and Seminole were acting as agents for the City when they engaged in the alleged antitrust violation, it seems unlikely that the City has a claim under the antitrust laws. Under these circumstances, the Court finds that there is very little risk of duplicative recovery arising from allowing Buddie to proceed on this claim.

#### 5. *Existence of More Direct Victims.*

In *Southaven,* the Sixth Circuit indicated the existence of more direct victims of an antitrust violation may justify denial of the antitrust standing to a plaintiff because the existence of more direct victims "is not likely to leave a significant antitrust violation undetected or unremedied." *Southaven,* 715 F.2d at 1087, quoting *AGCC,* 103 S.Ct. at 911. As noted in the preceding section, the City is a more direct victim of

the alleged violation. The City, however, is probably incapable of pursuing an antitrust claim, thereby leaving Buddie as the most direct victim capable of pursuing an antitrust claim.

#### 6. *Summary of AGCC/Southaven Factors.*

In sum, analysis of the causal connection and Buddie's status in the relevant market support a conclusion that Buddie's injuries are within the coverage of the antitrust laws. Analysis of the directness of the injury supports a contrary decision while analysis of the potential for duplicative recovery and the existence of more direct victims do not significantly support either conclusion. The Court must now consider whether this balance amongst the factors supports a finding of antitrust standing.

Neither the *AGCC* or *Southaven* decisions provide guidance to the Court on how the ultimate issue of antitrust standing is to be decided when all the factors do not support the same conclusion. In the *Southaven* case, however, the Sixth Circuit ruled that the causal connection alone was not enough to satisfy the antitrust standing requirement. In this case, Buddie has demonstrated the causal connection as well as the proper status within the market. Under these circumstances, the Court concludes that Buddie has sustained the type of injury which the antitrust laws were intended to prevent.[14]

#### C. *Conclusion on Antitrust Standing.*

Pursuant to this analysis, the Court concludes that Buddie has raised a genuine issue of material fact regarding injury-in-fact and the appropriateness of its claim for relief under the antitrust laws. Ac-

---

**13.** For a related discussion, *see* note 9 *supra.*

**14.** The *Southaven* and *AGCC* courts also supported their denials of antitrust standing to plaintiffs because the plaintiffs' claims were "remedial under other laws." *Southaven,* 715 F.2d at 1088, *AGCC,* 103 S.Ct. at 911. In this case, Buddie has an arguable tort claim for intentional interference with business relationships.

While Buddie could pursue this action in state court, it is not as clearly preferable to a federal antitrust claim as the matters discussed in *Southaven* or *AGCC.* Under this analysis, and considering the limited role given this factor by the *Southaven* and *AGCC* courts, the Court finds the existence of other remedies is not a significant factor in the analysis.

cordingly, the Court concludes that summary judgment on this basis is inappropriate.

## V. APPLICABILITY OF THE ANTITRUST LAWS TO BUDDIE'S CLAIM.

Peabody next argues that Buddie's claim is not actionable under the antitrust laws. Peabody argues that the allegations of Buddie's claim, even if proven, would not constitute a violation of § 1 of the Sherman Act. Alternatively, Peabody argues that the conduct complained of in the complaint falls within the *Noerr-Pennington* exemption from the antitrust laws. Upon review, the Court finds neither of these arguments well taken and denies the motion for summary judgment on this basis.

### A. *Applicability of § 1 of the Sherman Act.*

 Peabody argues that Buddie's complaint does not, as a matter of law, allege a violation of § 1 of the Sherman Act. Peabody characterizes Buddie's complaint as a claim that "sham bidding" constitutes a refusal to deal in violation of § 1 of the Sherman Act. Peabody claims, however, that the antitrust laws do not recognize such a cause of action.

Analysis of this argument begins with a review of the relevant statutory language. Section 1 of the Sherman Act states that

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1. In view of this statutory language, a claim under § 1 of the Sherman Act is comprised of three elements— (1) a contract, combination or conspiracy among two or more separate entities (2) that unreasonably restrains trade in a relevant market (3) and is in or affects inter-

state or foreign commerce. *See Davis-Watkins Co. v. Service Merchandise,* 686 F.2d 1190, 1195–96 (6th Cir.1982).

For purposes of this summary judgment motion, Peabody does not dispute the presence of a nexus with interstate commerce. Further, Peabody's sole claim with regard to the conspiracy element is that the prior state court proceeding precludes Buddie from establishing this element. Buddie has otherwise raised a genuine issue of fact regarding the conspiracy issue through its introduction of the various documents from the state criminal proceedings. Unless collateral estoppel precludes relitigation of this issue, therefore, the summary judgment is inappropriate on the presence of a conspiracy.

The remaining hotly-contested issue on this portion of the summary judgment motion is whether Buddie has raised a genuine issue of fact regarding the presence of an unreasonable restraint of trade in a relevant market. Peabody argues that the type of machinations with competitive bidding alleged by Buddie in this case do not constitute an unreasonable restraint of trade. Alternatively, Peabody argues that the determination of reasonableness cannot be made in this case because of Buddie's failure to define a proper relevant market.

The court's analysis of any restraint of trade under the antitrust laws may lead to any of three conclusions—the restraint is illegal under the per se rule, the restraining is illegal under the rule of reason, or the restraint does not violate the antitrust laws. In this case, the parties have cited legal authority in support of each of these three conclusions.

The Court's inquiry begins with a consideration of whether Buddie's claim states a cause of action under the rule of reason analysis.[15] Peabody argues that the manipulation of competitive bidding does not

---

**15.** Ordinarily, analysis of a restraint begins with a consideration of whether the challenged restraint is subject to analysis under the per se rule, a position advanced by Buddie citing *City of Atlanta v. Ashland Warren, Inc.,* 1982–1 Trade Cases ¶ 64,527 (N.D.Ga.1981). Based on the current state of the pleadings, however, the

Court believes that it need not consider the applicability of per se analysis at this stage of the litigation. The Court expressly reserves decision on the issue of whether the challenged restraint should be analyzed under the per se rule.

state a claim under § 1. Alternatively, Peabody argues that Buddie cannot show an anti-competitive effect upon a relevant market because the challenged conduct effected the award of only a single contract.

Peabody cites three principal decisions in support of its argument that manipulation of competitive bidding does not constitute an unreasonable restraint of trade under rule of reason analysis. *See Sitkin Smelting & Refining Co. v. FMC Corp.*, 575 F.2d 440 (3rd Cir.1978), *Security Fire Door Co. v. County of Los Angeles*, 484 F.2d 1028 (9th Cir.1973), *Parmelee Transportation Co. v. Keeshin*, 292 F.2d 794 (7th Cir.1961). A review of these cases indicates that the *Security Fire Door* and *Sitkin Smelting* cases are distinguishable, while the *Parmelee* decision is neither controlling or persuasive.

In *Sitkin Smelting*, the Third Circuit upheld the district court's entry of judgment n.o.v. in favor of defendants on an antitrust claim arising from an arrangement whereby a private company (FMC) agreed to give another defendant (Krentzman) the opportunity to match the highest bid made by its competitors in the bidding process and to award the contract to Krentzman. The Court found § 1 inapplicable because of the principle that a trader is free to choose its customers independently. 575 F.2d at 447. That case, however, is distinguishable because there is no evidence in the record that Krentzman tampered with the bidding process and because Krentzman agreed to match the highest bid of any other competitor. *Id.* at 447.

Likewise, the *Security Door* case is also distinguishable. In this case, the Ninth Circuit rejected a claim challenging a city's specification of a product made by only one manufacturer during a competitive bidding process. In that case, the court found that the choice of the specified product was made by the purchaser and that there was free and open competition amongst the prospective bidders in attempting to "get specified" by the city—the critical focus of competition. The court found no difficulty with a bidding process made uncompetitive

by the specification where there was open competition for "getting specified." 484 F.2d at 1030-31. As such, the case is distinguishable because there was no free and open competition at the critical decision making phase of the award of the transfer station contract.

The *Parmelee* decision, however, is not distinguishable from the claim presented by Buddie. In that case, the Seventh Circuit analyzed an antitrust claim alleging that the successful bidder for a competitively bid contract received the award because of the wrongful conduct of a public official. The Court concluded that plaintiffs were improperly attempting to stretch the Sherman Act "to wrongs not germaine to that act, even though such wrongs be actionable under state law." 292 F.2d at 804. The reasoning behind this conclusion, however, is unclear.

A contrary conclusion was reached in the recent decision of *Richard Hoffman Corp. v. Integrated Building Systems*, 581 F.Supp. 367 1984-1 Trade Cases ¶ 65,936 (N.D.Ill.1984). In that case, the district court denied a motion to dismiss where the successful bidder succeeded in imposing its choice of product upon the customer. Making allusions to the capacity of other bidders to present their products in a free market, the Court ruled that it was "unprepared to hold" that there was no claim under the antitrust laws. *Id.* at p. 374.

Upon review of these competing precedents, the Court finds the *Hoffman* decision more persuasive. Where a firm succeeds in tampering with the competitive bidding process in such a manner that competitive bidding becomes a farce, the Court believes that an unreasonable restraint of trade has occurred. Absent some economic analysis supporting a contrary conclusion, the Court will not preclude Buddie from proceeding on this theory.

■ Peabody has also argued that Buddie will be unable to show an effect upon competition in a relevant market because a relevant market cannot consist of only a single contract award. The principal decision supporting this theory is the Seventh

Circuit's recent decision in *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549 (7th Cir.1980). In that case, the Court ruled that the "loss by the plaintiff of a single contract with a single purchaser is simply not equivalent to a deleterious effect on the market." *Id.* at 558. Under a contrary rule, "the mere fact that one party bid successfully against another party for a contract would be equivalent to an anticompetitive effect and would raise the specter of an antitrust action being used as a remedy for any tortious conduct during the course of the competition." *Id.* Under the Seventh Circuit's view, such a ruling would "have more of a tendency to discourage than to protect competition." *Id.* at 559. Accordingly, the Seventh Circuit ruled that the plaintiff's claim failed to state a claim for relief under § 1 of the Sherman Act.

Although the *Havoco* decision has not been adopted by any other circuit court, Peabody urges this Court to apply the "single contract" rule to this case. In considering this argument, the Court is mindful of Peabody's repeated challenges to Buddie's claim on the basis that Buddie has failed to produce economic analysis supporting the theory behind its claim. Yet, the economic analysis supporting the *Havoco* Court's decision is unclear. Absent such an analysis, the Court will not preclude Buddie from proceeding on its claim under the "single contract" rule.

Accordingly, the motion for summary judgment on this basis is denied.

B. *Applicability of the Noerr-Pennington exemption.*

■ Peabody next argues that its conduct falls within the *Noerr-Pennington* exemption from the antitrust laws. Under this doctrine, concerted activities to influence the political processes are exempt from this coverage of the antitrust laws, even if they restrain competition. Because this Court concludes that the activities involved in this case are not the type of concerted political actions covered by the *Noerr-Pennington* doctrine, the Court finds the *Noerr-Pennington* doctrine inapplicable to this case.

The *Noerr-Pennington* doctrine derives from the Supreme Court decisions in *Eastern Railroad Presidents' Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1960) and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). In *Noerr*, the Supreme Court held that a railroad association's collective efforts to secure state legislation harmful to truckers were exempt from the Sherman Act, even though those efforts were deceptive and intended to reduce competition. The Court stated that it was

> clear that the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly.

365 U.S. at 136, 81 S.Ct. at 528. The Court distinguished agreements to seek legislation from agreements traditionally covered by § 1 stating that the agreements to seek legislation "bear very little if any resemblance to the combinations normally held violative of the Sherman Act." *Id.* Relying on concepts of representative democracy to support its decision, the Court stated:

> The whole concept of representation depends upon the ability of the people to make their wishes known to their representatives. To hold that the government retains the power to act in this representative capacity and yet, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of that Act.

*Id.* at 137, 81 S.Ct. at 529. *Noerr*, therefore, is based upon concepts of political representation.

Subsequently, the Court has reaffirmed and extended the doctrine of *Noerr*. In *United Mine Workers v. Pennington*, 381

U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) the defendant Union and large coal mine operators had approached the Secretary of Labor and officials of the Tennessee Valley Authority to obtain support for their agreements setting a minimum wage for coal miners. That agreement allegedly had the effect of forcing small coal mine operators out of business. The Supreme Court reversed a judgment in favor of the small mine operators because of a jury instruction which allowed the jury to consider the defendants' intent in approaching the various government officials. The Court stated that:

> Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as a part of a broader scheme itself violative of the Sherman Act.

*Id.* at 670, 85 S.Ct. at 1593. That rationale was extended even further in *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), where the Court extended *Noerr-Pennington* to appearances before courts and administrative agencies.

Buddie does not challenge this line of cases. Rather, Buddie argues that *Noerr-Pennington* is inapplicable because the government action involved in this case constitutes an administrative or ministerial award of a contract, not the policymaking matters which are the basis for the exemption in *Noerr* and *Pennington.* This Court, therefore, must consider the various approaches taken by other courts in defining the parameters of the *Noerr-Pennington* exemption.

The First, Fifth, and D.C. Circuits have adopted a commercial activities exemption to the *Noerr-Pennington* exemption. The First Circuit's decision in *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 424 F.2d 25 (1st Cir.1970) is illustrative of these cases. The *Noerr-Pennington* issue arose in the context of the defendants' attempt to induce governmental bodies to specify the defendants' products

for competitively bid contracts. The Supreme Court rejected the *Noerr-Pennington* defense to the claim stating that

> *Noerr* stressed the importance of free access to public officials vested with significant policy-making discretion. We doubt whether the court, without expressing additional rationale, would have extended the *Noerr* umbrella to public officials engaged in purely commercial dealings....

*Id.* at 33. The Court went on to define the boundaries of the *Noerr-Pennington* exemption by stating that the defendant

> is free to seek legislative change in this basic policy, but until such change is secured, Paddock's dealings with officials who administer the bid statute should be subject to the same limitations as its dealings with private consumers. Indeed, to hold otherwise might impair the effectiveness of competitive bidding.

*Id.* See also *Israel v. Baxter Laboratories,* 466 F.2d 272 (D.C.Cir.1972); *Woods Exploration & Products Co. v. Aluminum Company of America,* 438 F.2d 1286 (5th Cir.1971) *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972). But see *Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220 (7th Cir.1975); *Sun Valley Disposal Co. v. Silver State Disposal Co.,* 420 F.2d 341 (9th Cir.1969).

In the absence of Sixth Circuit authority on the validity of a commercial activities exception to the *Noerr-Pennington* doctrine, this Court concludes that it will follow the approach developed by the First, Fifth and D.C. Circuits and apply commercial activities exception. *Noerr-Pennington* is concerned with the needs of a representative democracy in the field of public policy making. These needs are not at issue in this case, where the parties are concerned with the award of a competitively bid contract which only incidentally involves a governmental body. The basis for the exemption, therefore, does not apply to this case.

Accordingly, the motion to dismiss on this basis is denied.

## VI. COLLATERAL ESTOPPEL

In its motion for summary judgment, Peabody has argued that a large number of factual issues are established for purposes of this litigation as a result of the collateral estoppel effect of the prior litigation. Pursuant to this Court's analysis of the antitrust standing and applicability of § 1 arguments, three of those issues are of particular importance. Buddie must be able to prove that (1) its bid was not defective; and (2) Peabody was not the lowest responsible bidder for the contract; and (3) the defendants in this action engaged in an antitrust conspiracy with respect to the contract award. Peabody contends that these factual matters are established by the prior state court litigation, while Buddie argues that collateral estoppel does not foreclosure relitigation of these issues as part of its antitrust claim.

Consideration of Peabody's claim of collateral estoppel begins with a review of the procedural posture in which collateral estoppel is being asserted. Both Peabody and Buddie were parties to the Buddie I action. As such, this case presents an issue regarding the application of collateral estoppel where there is mutuality of parties. Further, Peabody, the successful party in Buddie I, is using collateral estoppel in a defensive, not an offensive, posture. *See generally, Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 329, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). Under these circumstances, Peabody argues that collateral estoppel precludes relitigation of a number of issues decided in Buddie I, while Buddie argues that this Court has discretion to determine the collateral estoppel effect to be given to the Buddie I decision.

■■■ Peabody urges a rigid application of collateral estoppel to preclude relitigation of any issues considered in Buddie I. In support of this position, Peabody advances the traditional rule that

> when an issue of fact or law is actually litigated and determined by valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action

between the parties, whether on the same or a different claim.

Restatement (Second) of Judgments § 27 (1982). Under this rule, the Court has no discretion in determining whether to apply collateral estoppel to preclude relitigation of the issue. Peabody cites *James Talcott, Inc. v. Allahabab Bank, Ltd.,* 444 F.2d 451 (5th Cir.1971) as an example of the application of this rule. In that case, the Fifth Circuit applied collateral estoppel to preclude relitigation of issues decided in a prior state court proceeding. In defense of its position, the Fifth Circuit stated that

> whenever a court considers applying the doctrine of collateral estoppel, there is always a lingering question whether the party might have succeeded in proving his point if he had only been given a second chance at producing evidence. Without more, however, this question is not sufficient to outweigh the extremely important policy underlying the doctrine of collateral estoppel—that litigation of issues at some point must come to an end.

*Id.* at 463. Under this analysis, where parties such as Buddie have previously litigated an issue in a state court proceeding, collateral estoppel always precludes relitigation of the issue in a subsequent federal court proceeding.

In contrast, Buddie argues that the use of collateral estoppel is discretionary with the trial court. In support of this position, Buddie cites the Sixth Circuit's recent decision in *Cleveland v. Cleveland Electric Illuminating Co. (CEI),* 734 F.2d 1157 (6th Cir.1984). In that case, the Court upheld the trial judge's exercise of discretion in refusing to grant collateral estoppel effect to a prior administrative agency determination against the defendant in a proceeding to which the plaintiff was not a party. That case involved the offensive use of collateral estoppel absent mutuality. Relying upon the Supreme Court's decision in *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 329–30, 99 S.Ct. 645, 650–51, 58 L.Ed.2d 552 (1979), the Court found that the peculiar circumstances of an individual

case may justify a court's refusal to allow an offensive use of collateral estoppel absent mutuality. The *Cleveland v. CEI* and *Parklane Hosiery* decisions, however, do not suggest that this discretionary application of collateral estoppel would carry over to situations where mutuality is present.

■ While these decisions are instructive on the various considerations which the Court must weigh in determining the appropriate rule of collateral estoppel, neither decision is controlling authority on the issue raised in this case. Under the full faith and credit statute,

Judicial proceedings ... shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such state ... from which they are taken.

28 U.S.C. § 1738. This authority requires a federal court to give a prior state court judgment the same preclusive effect that it would have had in that state. Determination of the preclusive effect of the Buddie I judgment, therefore, turns on issues of Ohio state law. *See Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 466, 102 S.Ct. 1883, 1889, 72 L.Ed.2d 262 (1982); *see generally* Restatement (Second) of Judgments, § 86 (1982). The Court, therefore, must examine Ohio decisions to determine the appropriate rule of collateral estoppel in this case.

The seminal case on collateral estoppel in Ohio is *Norwood v. McDonald,* 142 Ohio St. 299, 52 N.E.2d 67 (1943). In that case, the Ohio Supreme Court adopted Restatement (First) approach to issues of *res judicata.* With respect to the rule of collateral estoppel, the Court held

a point or a fact which is actually and directly in issue in a former action and was there passed upon and determined by a court of competent jurisdiction may not be drawn in question in any future action between the same parties or their privies, whether the cause of action in the two actions be identical or different.

142 Ohio St. 299, 300 Syl. 3, 52 N.E.2d 67 (1943). Under this ruling, the Court lacks discretion to determine whether to apply collateral estoppel in this case. The *Norwood* decision has never been overruled by the Ohio Supreme Court.

■ Some question remains, however, whether the Ohio Supreme Court would follow the *Norwood* decision today because of the recent development of the Restatement (Second) of Judgments. The Restatement (Second) begins by setting out the traditional rule of collateral estoppel embraced by the *Norwood* court. Restatement (Second) of Judgments § 27 (1982). The restatement then goes on to provide for "exceptions to the general rule of issue preclusion." *Id.* at § 28.[16] Under this

**16.** In relevant part, the exceptions provide:

Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded in the following circumstances:

(1) The party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action; or

(2) The issue is one of law and (a) the two actions involve claims that are substantially unrelated, or (b) a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws; or

(3) A new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two

courts or by factors relating to the allocation of jurisdiction between them; or

(4) The party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action; or

(5) There is a clear and convincing need for a new determination of the issue (a) because of the potential adverse impact of the determination on the public interest or the interests of persons not themselves parties in the initial action, (b) because it was not sufficiently foreseeable at the time of the initial action that the issue would arise in the context of a subsequent action, or (c) because the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity or in-

rule, the Court retains discretion to determine whether or not to grant collateral estoppel effect to the prior judgment. *See also, Montana v. United States*, 440 U.S. 147, 155, 99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979).

The issue that emerges is whether the Ohio Supreme Court would follow the *Norwood* or the Restatement (Second) approach in determining if a trial court is granted discretion with respect to the application of preclusion. The Ohio Supreme Court's recent decision in *Goodson v. McDonough Power Equipment, Inc.*, 2 Ohio St.3d 193, 443 N.E.2d 978 (1983) merits consideration. In that case, the Ohio Supreme Court ruled that Ohio would not allow offensive use of collateral estoppel absent mutuality in products liability actions. Significantly, the Ohio Supreme Court relied heavily upon the Restatement (Second) in reaching its decision. Although the Court did not consider the exceptions to the general rule of issue preclusion found in § 28 of the Restatement (Second), the Court followed the remainder of the restatement's discussion of issue preclusion. Based upon this authority, this Court concludes that the Ohio Supreme Court would apply the exceptions to the general rule of issue preclusion found in the Restatement (Second).

Having concluded that the Court will exercise discretion in determining the collateral estoppel effect of facts decided in the prior state court litigation, the Court must now determine whether it will exercise that discretion to allow relitigation of the facts raised by Peabody. As noted before, the merit of Peabody's legal defenses depends upon resolution of three factual matters— (1) the existence of a conspiracy amongst the defendants; and (2) the adequacy of Buddie's bid; and (3) Peabody's status as the lowest responsible bidder. If Buddie cannot prevail on these matters, the legal analysis of Buddie's § 1 claim and antitrust standing require entry of judgment in favor of Peabody.

### A. Conspiracy Amongst The Defendants.

In order to make out a claim under § 1 of the Sherman Act, Buddie must prove that there was an agreement between the defendants to divert the contract award to Peabody. Peabody claims that the Buddie I decision resolved this issue against Buddie and that the decision collaterally estops Buddie from relitigating the issue in this Court. Although the judgment entry from the Common Pleas Court does not contain any reference to collusion, the opinion of the Court makes some relevant findings.[17] In relevant part, the opinion states:

> Nor has there been any evidence of impropriety or conduct on the part of any public official or any bidder in the conduct of these negotiations. Nor was there any collusion among bidders presented by the testimony of either the Plaintiffs or Defendants. If anything, there was a strong showing of independence on the part of bidders....

Opinion of the Court at 5. These findings became part of the final judgment when the Court of Appeals affirmed the decision of the Buddie I court and the time for appeal to the Ohio Supreme Court passed.

Subsequently, the relationship between Peabody, Seawright, Plants and Seminole was discovered. On December 21, 1978, Seawright was indicted by the Cuyahoga County Grand Jury on one count of grand theft, one count of having an unlawful interest in a public contract and two counts of complicity. On that same date, Seminole and Plants were indicted for grand theft and having an unlawful interest in a public contract.[18] Three days prior to the return

centive to obtain a full and fair adjudication in the initial action.
Id.

**17.** The trial judge incorporated the opinion of the Court into the judgment entry by stating that "the Court's further findings of fact are set forth in its written opinion filed in these proceedings."

**18.** While the indictments do not specifically refer to the contract for the solid waste treatment plant, the documents attached to the file clearly

of the indictments, the Common Pleas Court granted immunity to Frank John Gerdnic, Peabody's vice president of marketing, in exchange for his testimony regarding these transactions.

Ultimately, Seawright pled guilty to one count of attempt and complicity under Ohio Rev.Code 2923.02–03. Seminole pled guilty to one count of having an unlawful interest in a public contract under Ohio Rev.Code 2921.42 and Plants pled guilty to attempt to have an unlawful interest in a public contract under Ohio Rev.Code 2921.42 and 2923.02. The remaining counts of the indictments were dismissed as part of the plea bargain.

The issue confronting the Court is whether the Buddie I court's findings regarding collusion preclude Buddie from presenting evidence on the conspiracy issue to this Court. Two of the exceptions to the general rule of issue preclusion stated in § 28 of the Restatement (Second) apply to this case.

Exception 3 allows relitigation of an issue where there are procedural differences between the two courts. In relevant part, that provision allows relitigation where:

A new determination of the issue is warranted by differences in the quality or expensiveness of the procedures followed in the two courts....

In Buddie I, the trial judge, apparently upon his own motion, ordered the trial on the merits to be consolidated with the hearing on preliminary injunction. Plaintiffs received only 17 days between the filing of their action and the original hearing in which to prepare their case. Discovery was truncated, unlike the procedure which would be followed in this federal court action. Under these circumstances, the differences in the extensiveness or quality of the procedures followed between this Court and the Common Pleas Courts warrants a new determination on this issue.

Alternatively, exception 5, supports allowing a new determination where the party sought to be precluded did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action. In relevant part, the exception provides

There is a clear and convincing need for a new determination of the issue ... (c) because the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action.

In this case, the Court has already found defects in the fullness of the procedures available in the initial action. Further, the Court notes that the existence of collusion was but one of a number of issues raised in Buddie I. A review of the trial judge's opinion indicates that collusion was a matter of only tangential concern to the parties in the initial action.[19] In view of the limited time available for preparation of the initial action and the limited importance of the collusion issue in the Buddie I action, the Court finds that the requirements for exception 5 are also met.[20]

indicate that the indictments arise out of this transaction.

**19.** The Court notes that the presence of an antitrust conspiracy was not, and in fact could not have been, an issue in the state court action. Buddie is attempting to prove an antitrust conspiracy without demonstrating "collusion among bidders." Likewise, the conspiracy alleged in this case was not presented to the state court because Seawright, Plants, and Seminole were not parties to the state court litigation. Finally, the Court concludes that a finding of an absence of collusion among bidders under the public contract laws does not necessarily forecloses a finding of conspiracy under the antitrust laws.

**20.** Another basis for denying collateral estoppel effect to the Buddie I court's determination on the collateral estoppel issue is its apparent conflict with the guilty pleas in the common pleas court action. Under the Restatement (Second),

When in two actions inconsistent final judgments are rendered, it is the later, not the earlier, judgment that is accorded conclusive effect in the third action under the rules of *res judicata*.

*Id.* at § 15. Assuming that the guilty pleas by Seawright and Plants conflict with the finding of no collusion made by the Buddie I court, this

### B. *Adequacy of Buddie's Bid and Propriety of Award to Peabody.*

Regardless of the Court's ruling on the collusion issue, Peabody argues that Buddie is precluded from relitigating the issue of the adequacy of its bid. In relevant part, the Buddie I court found that Buddie

> submitted a bid which was found defective in sixteen specific ways varying from highly critical items to relatively minor engineering issues. There were inconsistencies in the bid of Buddie which justifiably warranted the consultant company in suggesting rejection of Buddie, despite its submission of the lowest bid.

Opinion of the Court at 4. Notwithstanding the ambiguity of the Buddie I Court's findings, Peabody argues that this finding precludes Buddie from proving that it would have received the bid under any circumstances. In contrast, Buddie argues that this fact finding is tainted by the trial court's ignorance of Plants' dubious role in this action and, therefore, need not be followed.[21]

The trial judge also made findings on the propriety of the City's award of the contract to Peabody. In the judgment entry, the trial court found that there was

> No evidence of error, fraud or abuse of discretion was presented and that it would not be a proper exercise of the court's function to substitute its judgment for the carefully determined discretion of the Board of Control of the City of Cleveland on a matter of great public importance.

In the opinion of the Court, the trial judge went on to explain the limited role of a court in reviewing an award of a public contract and explaining his basis for accepting the propriety of that award. Opinion of the Court at 5–6. Based on these findings, Peabody argues that Buddie is foreclosed from proving that Peabody would not have received the contract award.

Both of these fact findings were made in the context of the limited role granted a court under Ohio law in reviewing the awarding of contracts by a municipality. Under Ohio law, contracting authorities are granted a great deal of discretion in their awards of public contracts. *See State ex rel Cleveland Trinidad Paving Co. v. Board of Public Service,* 81 Ohio St. 218, 90 N.E. 389 (1909); *State ex rel Walton v. Hermann,* 63 Ohio St. 440, 59 N.E. 104 (1900). Judicial review is limited and the courts are not authorized to interfere with the exercise of the discretion of the public authorities in awarding public contracts except in cases of fraud or abuse of discretion. *Altschul v. Springfield,* 48 Ohio App. 356, 193 N.E. 788 (1933). Under these authorities, the trial court imposed a heavy burden of persuasion upon Buddie in evaluating Buddie's challenge to the award.

Exception 4 to the general rule of issue preclusion recognizes differences in the burden of persuasion with respect to an issue as a basis for allowing relitigation of that issue. In relevant part, the exception allows relitigation where a

> party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the subsequent action. . . .

Restatement (Second) at § 28(4). In this antitrust action, Buddie might not have to shoulder the heavy burden of persuasion usually applied to a challenge to a state law challenge of an award of a public contract.[22] Under this analysis, the Court con-

---

rule applies to preclude granting any collateral estoppel effect to the Buddie I court's findings on collusion.

**21.** Under any concept of collateral estoppel, Buddie is not precluded from relitigating an issue unless the "determination was essential to the judgment." Ohio law limits judicial review of a contract award to an abuse of discretion standard. The finding that Buddie's bid was

defective, therefore, was not an essential finding to support the Buddie I court's affirmance of the City's award.

**22.** As noted before, the Court has reserved decision on the standard it will use in reviewing the City's decision to award the contract to Peabody. *See* note 10, *supra.* Under these circumstances, the Court believes that summary judgment on this issue is inappropriate at this time.

cludes that the exception applies to this case, and Buddie will not be estopped from challenging either of these trial court findings.

### C. *Conclusion.*

Under this analysis, the Court concludes that collateral estoppel will not preclude Buddie from challenging whether Buddie should have received the contract award or whether there was a conspiracy in this case. Accordingly, the motion for summary judgment based on collateral estoppel is denied.

In reaching this conclusion, the Court is mindful that this decision represents a deviation from established concepts of collateral estoppel. This decision should not be interpreted as opening the floodgates to relitigation of the vast majority of factual issues. The peculiar facts presented by this case make this case an unusually good candidate for use of the exceptions to the general rule of issue preclusion. It is important to interpret the exceptions to the general rule of issue preclusion so as not to overwhelm the general rule. Thus, while concluding that the general rule does not apply to this case, the Court emphasizes the narrowness of this holding.

### VII. CONCLUSION

Pursuant to the foregoing analysis, and subject to the limitations noted in the opinion, the motion for summary judgment is denied.