833 F.2d 867
 56 USLW 2310, 1987-2 Trade Cases 67,765,
1987-2 Trade Cases 67,823
 STATE OF COLORADO ex rel. COLORADO ATTORNEY GENERAL, Duane
Woodard, Plaintiff- Appellant and Cross-Appellee,
v.
WESTERN PAVING CONSTRUCTION CO., Defendant-Appellee and
Cross-Appellant.
 Nos. 86-1363, 86-1420.
 United States Court of Appeals,
Tenth Circuit.
 Nov. 16, 1987.
Rehearing Granted Dec. 31, 1987.*
 
 Stephen H. Anderson, Circuit Judge, concurred and filed opinion.
 David S. Harmon, Asst. Atty. Gen., Antitrust Section (Thomas P. McMahon, First Asst. Atty. Gen., Chief, Antitrust Section, Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., and Richard H. Forman, Sol. Gen., with him on the briefs), for plaintiff-appellant and cross-appellee.
 John Bodner, Jr., Howrey & Simon, Washington, D.C. (Marcia Press Kaplan of Howrey & Simon, Washington, D.C., and B. Lawrence Theis of Walters & Theis, Denver, Colo., with him on the brief), for defendant-appellee and cross-appellant.
 Before McKAY, SEYMOUR and ANDERSON, Circuit Judges.
 McKAY, Circuit Judge.
 
 
 1
 On July 19, 1984, plaintiff, State of Colorado, filed a private antitrust claim under section one of the Sherman Antitrust Act, 15 U.S.C. Sec. 1 (1982), against defendant, Western Paving Construction Company. Plaintiff accuses defendant of engaging in a conspiracy to rig bids on Colorado highway construction projects from "as early as January of 1971" and extending "at least to some time in 1978." Amended Complaint, record, vol. 1, doc. 2, at 3. Because plaintiff did not allege that its cause of action arose on or after July 20, 1980, the "critical date" for purposes of the antitrust statute of limitation, 15 U.S.C. Sec. 15b (1982), it claimed that the statute should be tolled because defendant fraudulently concealed the alleged violations.
 
 
 2
 After both parties conducted discovery on the fraudulent concealment issue, defendant filed two motions. First, it filed a motion for summary judgment, claiming that plaintiff had not shown fraudulent concealment and, therefore, the action should be dismissed under the statute of limitations. Second, defendant filed a motion to dismiss and to grant attorney's fees under Fed.R.Civ.P. 11, contending that plaintiff's action was frivolous and that its investigation was inadequate. Plaintiff responded by filing a motion for partial summary judgment on the statute of limitations issue.
 
 
 3
 The district court granted defendant's motion for summary judgment, finding that plaintiff had not shown affirmative acts of concealment and that a self-concealing conspiracy alone would not toll the antitrust statute of limitations, 630 F.Supp. 206. The court also denied defendant's motion for attorney's fees, finding plaintiff's action was not frivolous and its investigation was adequate.
 
 
 4
 Plaintiff appeals, arguing that it has shown either that defendant engaged in a self-concealing conspiracy or that defendant or its coconspirators committed affirmative acts of concealment. Either of these propositions, plaintiff claims, entitles plaintiff to toll the statute of limitations under the fraudulent concealment doctrine. Defendant cross-appeals, claiming that the district court erred in refusing to grant it attorney's fees.
 
 I. Background
 
 5
 Plaintiff's most reliable evidence of fraudulent concealment arises from events surrounding three specific construction projects: (1) the 1971 Newcastle-Easterly project; (2) the 1972 Lamar-East project; and (3) the 1974 Parker Road project. Evidence on these events is derived from the deposition testimony of Larry Wallace Corn and Donald G. Popejoy.
 
 
 6
 Mr. Corn, an employee of one of defendant's alleged coconspirators, testified extensively on his involvement in bidrigging on the Newcastle project. Prior to giving any testimony, Mr. Corn entered a settlement agreement with plaintiff concerning his and his employer's bidrigging activities in Colorado. As a part of that agreement, Mr. Corn agreed to fully cooperate in plaintiff's efforts to investigate and prosecute other alleged bidriggers. While Mr. Corn admitted participation in thirteen bidrigging schemes, the Newcastle project is the only project in which he mentions defendant as one of the conspirators.
 
 
 7
 Mr. Corn organized the bidrigging on the Newcastle project. To carry out his scheme, he first consulted the plan holders list published by plaintiff and asked the state engineer which contractors had actually looked at the project. He then compiled a list of potential bidders, their telephone numbers and, in those cases in which he knew, the party to contact. Once the list was completed, Mr. Corn began contacting the potential bidders.
 
 
 8
 In making his contacts, Mr. Corn started with the bidders he felt would be the most serious competitors. Once these companies had agreed to cooperate, he continued down his list until he had contacted all potential bidders. While defendant was allegedly on Mr. Corn's list, it was not one of the serious competitors.
 
 
 9
 Mr. Corn testified that he made most contacts by telephone from a hotel room in Denver in which he stayed during the bidletting on the Newcastle project. Mr. Corn testified that when he called a potential bidder, he first obtained a commitment to participate in the bidrigging scheme and then revealed the approximate amount of Corn Construction's bid on the project. After Mr. Corn obtained a commitment to participate in the scheme, he added the name of the person with whom he spoke to his list of bidders.
 
 
 10
 Mr. Corn had difficulty remembering the details of these contacts. When asked about details of the conversations, he replied:
 
 
 11
 There isn't any way I can sit here today and tell you exactly what I told those people thirteen, fourteen years ago. I can tell you I got the job rigged and I talked to these people and gave them our bid or very close to that figure so they would have an idea of where to bid.
 
 
 12
 Deposition of Larry Wallace Corn, record, vol. 2, at 46. Mr. Corn also had difficulty remembering which parties he had actually contacted and how many times he may have called particular persons. However, he maintained that each party he contacted agreed to participate in the bidrigging scheme and agreed to submit a complementary bid.
 
 
 13
 After all contacts were made, Mr. Corn was ready to attend the bidletting ceremony. Just prior to attending, or immediately after the ceremony, Mr. Corn destroyed his list of potential bidders. He testified that this was done to avoid discovery of the list and to cover up the bidrigging scheme. At the bidletting ceremony, Corn Construction, Mr. Corn's employer, was the successful bidder. As was required by plaintiff, Mr. Corn executed an affidavit stating that neither he nor Corn Construction had colluded in arriving at the bid amount. Mr. Corn testified that he executed this affidavit even though he knew it was false.
 
 
 14
 Mr. Corn remembered specific contacts with defendant. He testified that he initially called Alvin Walters and asked "if they would allow us to be the successful bidder on the job and he told me that I'd have to talk to Harold Stillman." Id. at 22. At the time, Mr. Stillman was responsible for all defendant's bids on projects outside the Denver metropolitan area. Mr. Walters denied any conversation with Mr. Corn.
 
 
 15
 Mr. Corn claimed that he spoke to Mr. Stillman, who agreed to cooperate and to submit a complementary bid. Specifically, Mr. Corn testified that he gave Corn Construction's bid amount to Mr. Stillman, id. at 47, and that he called Mr. Stillman from his hotel room. Id. at 55. When asked about a specific recollection of the conversation, Mr. Corn stated:
 
 
 16
 I can tell you the gist of it. I told him we were interested on the job in New Castle, we were set up in the pit and we were wondering if they'd go along with us. I can't remember what his immediate reply was. The end result was that they said they would, but we owed them a job.
 
 
 17
 Id. at 63. On cross-examination, Mr. Corn reiterated:
 
 
 18
 I just asked him if he would go along with us on it and that we were interested in the job, that we were set up there and would be willing to give him a future job. And he agreed and just said that we owed him one or something to that effect.
 
 
 19
 ....
 
 
 20
 I knew after I talked to him that he was willing to go along with us and we owed him a future job. I don't remember exactly how that was arrived at.
 
 
 21
 Id. at 117. Despite this testimony, Mr. Corn admitted that defendant never received a complementary bid from Corn Construction. He testified that Newcastle is the only project about which he talked to defendant.
 
 
 22
 Defendant did not present any testimony to counter Mr. Corn's testimony as to conversations with Mr. Stillman because none is available. Mr. Stillman died long before plaintiff filed this suit; thus, he was never able to give his testimony concerning the events surrounding the Newcastle project. Defendant's other employees denied any knowledge of a bidrigging scheme, and Mr. Corn admitted that he has no evidence that Mr. Stillman revealed the scheme to any other employee.
 
 
 23
 Plaintiff does have a bid tabulation showing that defendant submitted a bid on the Newcastle project. However, there is no other evidence to prove or disprove Mr. Corn's testimony. With the exception of the bid tabulation, both defendant and plaintiff have destroyed all documents relating to the Newcastle project, and Mr. Stillman's testimony is unavailable. Thus, the district court had the testimony of only one man to determine whether defendant actually participated in any scheme to rig the bid on the Newcastle project.
 
 
 24
 Plaintiff contends, however, that Mr. Corn's testimony was supported by Mr. Popejoy's deposition testimony concerning the Lamar and Parker Road projects. Mr. Popejoy is an employee of Popejoy Construction Company, Inc., another of defendant's alleged coconspirators. Like Mr. Corn and Corn Construction, Mr. Popejoy and his employer entered a settlement agreement with plaintiff and federal authorities. The agreements cover all antitrust activities by Mr. Popejoy and Popejoy Construction, and as a portion of the agreements, Mr. Popejoy agreed to fully cooperate with plaintiff in its investigation and prosecution of other alleged bidriggers.
 
 
 25
 Mr. Popejoy testified that prior to the bidletting on the Lamar project, he contacted a number of potential bidders. He wished to determine whether the bidder was "interested" in the project. One Colorado construction company had told Mr. Popejoy that if a company said it was "interested" in the project, the company was bidding below the engineer's estimate. On the other hand, if the company said it was "not interested," it was bidding above the estimate. While Mr. Popejoy understood the meanings attached to "interested" and "not interested," he did not actually know how many, if any, of the other companies actually attached that particular meaning to their statements.
 
 
 26
 Mr. Popejoy testified that when he made the calls on the Lamar project, none of the bidders said it was interested. As a result, Mr. Popejoy submitted the bid he had prepared prior to making the contacts. He testified that if one or more potential bidder had expressed interest in the project, his bid would probably have been lower, but not more than $5,000. Mr. Popejoy also said that although he now realizes the calls probably violated antitrust laws, when he made them he did not realize he was committing antitrust violations. Rather, he thought he was testing the market for interest in the project. As was the practice, after Popejoy Construction won the bid on the Lamar project, Mr. Popejoy executed a noncollusion affidavit. Mr. Popejoy did not knowingly execute a false affidavit, however, because he did not know his telephone calls amounted to collusion.
 
 
 27
 Mr. Popejoy's contacts with defendant were made through Mr. Walters. Mr. Popejoy said that he asked Mr. Walters if defendant was interested in bidding on the Lamar project, and Mr. Walters replied that it was not. Mr. Popejoy then remembered that Mr. Walters asked what Mr. Popejoy was going to do about Domenic Leone, another bidder on the project. Mr. Popejoy responded that he was going to take his chances and recalled that Mr. Walters replied, "That's a very interesting approach." Mr. Walters' version of the conversation was different. He admitted that he spoke with Mr. Popejoy but testified that he simply told Mr. Popejoy that defendant was not interested in the project and, in fact, stated that defendant was getting out of the business of bidding projects outside the Denver metropolitan area.
 
 
 28
 As with the Newcastle project, plaintiff does have a bid tabulation showing defendant bid on the Lamar project, but all other documents related to the project have been destroyed in the normal course of business. Furthermore, neither Mr. Popejoy's nor Mr. Walters' testimony can be corroborated because all other employees of defendant deny knowledge of any bidrigging activities, and Mr. Popejoy admitted that he spoke to no one about the call to defendant. Mr. Popejoy, however, admitted that this is the only contact he ever had with defendant and that, while some other companies asked Popejoy Construction to submit a complementary bid on some other project, defendant never requested any quid pro quo for its allegedly complementary bid on the Lamar project.
 
 
 29
 Mr. Popejoy also indirectly implicated defendant in bidrigging on the Parker Road project. He testified that while he was in Denver to bid on that project, he was approached by an employee of Peter Kiewit, another of defendant's alleged coconspirators, and asked to raise Popejoy Construction's bid on the project. Mr. Popejoy initially refused to raise the bid, but when he was promised a $10,000 payment in return for the increase, he agreed to change the bid. Mr. Popejoy had no actual knowledge of any contact between defendant and Peter Kiewit but claimed that he would not have received the $10,000 unless all bidders had been contacted and had agreed to go along with the bidrigging scheme. Again, a bid tabulation shows defendant as a bidder on the project, but all other documentation has been destroyed. Furthermore, plaintiff presented no other evidence corroborating Mr. Popejoy's testimony.
 
 II. Tolling the Statute of Limitations
 
 30
 The antitrust statute of limitations states: "Any action to enforce any cause of action under [antitrust statutes] shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. Sec. 15b (1982). While this statute seems to allow only a four-year period in which to bring an antitrust claim, every circuit court that has decided the issue allows tolling of the statute under the fraudulent concealment doctrine. See Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 394 (6th Cir.1975); Weinberger v. Retail Credit Co., 498 F.2d 552, 555 (4th Cir.1974); General Elec. Co. v. City of San Antonio, 334 F.2d 480, 484-85 (5th Cir.1964); Westinghouse Elec. Corp. v. City of Burlington, 326 F.2d 691, 692 (D.C.Cir.1964) (per curiam); Westinghouse Elec. Corp. v. Pacific Gas & Elec. Co., 326 F.2d 575, 576 (9th Cir.1964); Allis-Chalmers Mfg. Co. v. Commonwealth Edison Co., 315 F.2d 558 (7th Cir.1963); Public Serv. Co. v. General Elec. Co., 315 F.2d 306 (10th Cir.), cert. denied, 374 U.S. 809, 83 S.Ct. 1695, 10 L.Ed.2d 1033 (1963); Atlantic City Elec. Co. v. General Elec. Co., 312 F.2d 236 (2d Cir.1962), cert. denied, 373 U.S. 909, 83 S.Ct. 1298, 10 L.Ed.2d 411 (1963); Kansas City, Mo. v. Federal Pac. Elec. Co., 310 F.2d 271 (8th Cir.), cert. denied, 371 U.S. 912, 83 S.Ct. 256, 9 L.Ed.2d 171 (1962), 373 U.S. 914, 83 S.Ct. 1297, 10 L.Ed.2d 415 (1963); see also Berkson v. Del Monte Corp., 743 F.2d 53 (1st Cir.1984) (discusses fraudulent concealment without deciding whether it should or should not apply), cert. denied, 470 U.S. 1056, 105 S.Ct. 1765, 84 L.Ed.2d 826 (1985). Plaintiff argues its claim falls within this exception to the statute of limitations. To understand application of fraudulent concealment to plaintiff's case, we first review the policies behind statutes of limitations and the fraudulent concealment doctrine.
 
 A. Statutes of Limitations Policies
 
 31
 "Statutes of limitation are vital to the welfare of society and are favored in the law. They are found and approved in all systems of enlightened jurisprudence." Wood v. Carpenter, 101 U.S. (11 Otto) 135, 139, 25 L.Ed. 807 (1879). They reflect a balancing of "the interests in favor of protecting valid claims" and "the interests in prohibiting the prosecution of stale ones." Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 463-64, 95 S.Ct. 1716, 1721-22, 44 L.Ed.2d 295 (1975). Plaintiffs with valid claims have a right to recover; however, the passage of time may make it more difficult to distinguish between valid and invalid claims.
 
 
 32
 Thus in the judgment of most legislatures and courts, there comes a point at which the delay of a plaintiff in asserting a claim is sufficiently likely either to impair the accuracy of the factfinding process or to upset settled expectations that a substantive claim will be barred without respect to whether it is meritorious.
 
 
 33
 Board of Regents of the Univ. of N.Y. v. Tomanio, 446 U.S. 478, 487, 100 S.Ct. 1790, 1796, 64 L.Ed.2d 440 (1980). Statutes of limitations serve that purpose. They cut off a plaintiff's right to pursue a claim and thereby avoid trial of stale claims.
 
 
 34
 Statutes of limitations assist the courts by making the adjudication process more efficient. This process is otherwise "hampered by stale evidence and absent witnesses." Ohio v. Peterson, Lowry, Rall, Barber & Ross, 651 F.2d 687, 694 (10th Cir.), cert. denied, 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981).
 
 
 35
 Making out the substantive elements of a claim for relief involves a process of pleading, discovery, and trial. The process of discovery and trial which results in the finding of ultimate facts for or against the plaintiff by the judge or jury is obviously more reliable if the witness or testimony in question is relatively fresh.
 
 
 36
 Tomanio, 446 U.S. at 487, 100 S.Ct. at 1796. Thus, if statutes of limitations cut off stale claims, courts are left to try cases with more reliable evidence, thereby producing more reliable results. In addition, disallowing stale claims permits courts to try more cases because stale claims take longer to try. Witnesses with faded memories usually take longer to examine. When direct evidence has been lost or destroyed, litigants must use circumstantial evidence to prove the same points, and circumstantial evidence usually takes longer to present. Statutes of limitations thus allow courts to avoid these problems.
 
 
 37
 Statutes of limitations also benefit defendants in at least two important ways. First, they protect defendants against invalid claims. "[F]alse or fraudulent claims ... might be difficult to disprove if not brought until after relevant evidence has been lost or destroyed and witnesses have become unavailable." Gates Rubber Co. v. USM Corp., 508 F.2d 603, 611 (7th Cir.1975). By limiting the period during which a plaintiff is allowed to file a claim, the legislature reduces the risk that a defendant will be required to defend against a false claim. Second,
 
 
 38
 entirely apart from the merits of particular claims, the interest in certainty and finality in the administration of our affairs, especially in commercial transactions, makes it desirable to terminate contingent liabilities at specific points in time. It is this interest in finality which underlies the description of a limitations act as a "statute of repose."
 
 
 39
 Id. Once the statutory period has passed, a party can be certain that it will no longer be required to answer on the merits a contingent liability. The mere passage of time operates to cut off all claims. Thus, after a period of time, a party can carry on its affairs with no need to worry about contingent liabilities.
 
 Statutes of limitations
 
 40
 are statutes of repose; and although affording plaintiffs what the legislature deems a reasonable time to present their claims, they protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise.
 
 
 41
 United States v. Kubrick, 444 U.S. 111, 117, 100 S.Ct. 352, 357, 62 L.Ed.2d 259 (1979). Because of their mechanical application, "statutes of limitation result in hardship to plaintiffs in some cases." Steele v. United States, 599 F.2d 823, 828 (7th Cir.1979). However, "alleviation of that hardship is a matter of policy for the Congress." Kaltreider Const., Inc. v. United States, 303 F.2d 366, 368-69 (3d Cir.), cert. denied, 371 U.S. 877, 83 S.Ct. 148, 9 L.Ed.2d 114 (1962). Once Congress, or some state legislative body, has determined what is a sufficient period for bringing a claim, the courts should refuse to hear the claim after that time has passed. "Stale conflicts should be allowed to rest undisturbed after the passage of time has made their origins obscure and the evidence uncertain." Dayco Corp., 523 F.2d at 394. Plaintiffs should not be allowed to argue that no logical reason exists for applying the statute to their case. After all,
 
 
 42
 [s]tatutes of limitation find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles. They are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost. Order of Railroad Telegraphers v. Railway Express Agency, 321 U.S. 342, 349 [64 S.Ct. 582, 88 L.Ed. 788]. They are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the voidable and unavoidable delay. They have come into the law not through the judicial process but through legislation. They present a public policy about the privilege to litigate.
 
 
 43
 Chase Sec. Corp. v. Donaldson, 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945) (footnote omitted). Legislatures enact a statute of limitations to apply to all cases covered by the statute. As the legislature is the one to make such policy decisions, the only decision for the courts is whether the claim is within the coverage of the statute.
 
 B. Fraudulent Concealment
 
 44
 Although "[s]tatutes of limitation are vital to the welfare of society," Wood, 101 U.S. (11 Otto) at 139, "most courts and legislatures have recognized that there are factual circumstances which justify an exception to these strong policies of repose." Tomanio, 446 U.S. at 487, 100 S.Ct. at 1797. Legislatures create some exceptions by enacting tolling provisions. In addition, a court that faces a factual circumstance that makes application of a statute of limitations particularly harsh may develop a tolling doctrine to ameliorate the harshness. One judicially created tolling doctrine is fraudulent concealment.
 
 
 45
 In explaining the basis for tolling under a fraudulent concealment claim, the Supreme Court stated:
 
 
 46
 [Statutes of limitation] were enacted to prevent frauds; to prevent parties from asserting rights after the lapse of time had destroyed or impaired the evidence which would show that such rights never existed, or had been satisfied, transferred, or extinguished, if they ever did exist. To hold that by concealing a fraud, or by committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it, is to make the law which was designed to prevent fraud the means by which it is made successful and secure.
 
 
 47
 Bailey v. Glover, 88 U.S. (21 Wall.) 342, 349, 22 L.Ed. 636 (1875). The Court went on to hold thatwhen there has been no negligence or laches on the part of a plaintiff in coming to the knowledge of the fraud which is the foundation of the suit, and when the fraud has been concealed, or is of such a character as to conceal itself, the statute does not begin to run until the fraud is discovered by, or becomes known to, the party suing, or those in privity with him.
 
 
 48
 Id. 88 U.S. (21 Wall.) at 349-50. The Supreme Court, thus, adopted fraudulent concealment as a legitimate means of tolling a statute of limitations. The Court subsequently stated that this "doctrine is read into every federal statute of limitation." Holmberg v. Armbrecht, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946). As a result, courts have applied fraudulent concealment to most statutes of limitations.
 
 
 49
 Despite broad use of the doctrine, courts have developed principles that limit the factual circumstances to which fraudulent concealment will apply. To maintain a fraudulent concealment claim, a plaintiff must plead and prove three elements: (1) use of fraudulent means by defendant; (2) concealment of plaintiff's cause of action; and (3) plaintiff's due diligence in attempting to uncover the claim. See, e.g., King & King Enters. v. Champlin Petroleum Co., 657 F.2d 1147, 1154 (10th Cir.1981), cert. denied, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982); Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp., 546 F.2d 570, 574 (4th Cir.1976). A plaintiff who fails to plead and prove all three elements will have its claim dismissed as barred by the statute of limitations.
 
 
 50
 Pleading requirements for fraudulent concealment are very strict. Some courts invoke Fed.R.Civ.P. 9(b) and require a plaintiff to meet the pleading requirements for fraud. See, e.g., Dayco Corp., 523 F.2d at 394. Other courts, while not specifically invoking Rule 9, still require specificity and particularity in pleading. Rutledge v. Boston Woven Hose & Rubber Co., 576 F.2d 248, 250 (9th Cir.1978); Weinberger, 498 F.2d at 555. While a pleading deficiency can be corrected by an amendment, failure to correct the problem after the amendment results in a dismissal. See Charlotte Telecasters, 546 F.2d at 574; see also NL Indus., Inc. v. Gulf & W. Indus., Inc., 650 F.Supp. 1115, 1135 (D.Kan.1986) (plaintiff allowed to amend but warned to "set forth facts with particularity "). These pleading requirements reflect the same concerns that underlie the requirement to plead fraud with particularity. Allegations of fraudulent concealment, like allegations of fraud, are harsh and may be difficult to disprove, particularly if some time has passed since the alleged concealment. Thus, in order to put the defendant on notice as to the specific allegations, courts require specific pleading. This informs the defendant of the alleged acts of concealment and allows the trial court to determine, at an early stage, whether the plaintiff has a valid concealment claim.
 
 
 51
 The pleading must set forth specific facts to prove each of the three elements of a fraudulent concealment. "[M]erely intoning the word 'fraudulently' is not sufficient to avoid the statute." Charlotte Telecasters, 546 F.2d at 574. Rather, "[t]he term 'fraudulent concealment' implies active misconduct." Taylor v. Meirick, 712 F.2d 1112, 1118 (7th Cir.1983). Courts have alternatively stated that the defendant must engage in "some trick or contrivance," Wood, 101 U.S. (11 Otto) at 143, "some misleading, deceptive or otherwise contrived action or scheme," Hobson v. Wilson, 737 F.2d 1, 34 (D.C.Cir.1984), cert. denied, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985), or "some positive misconduct." Kriegesmann v. Barry-Wehmiller Co., 739 F.2d 357, 359 (8th Cir.), cert. denied, 469 U.S. 1036, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984). The underlying requirement is that defendant must engage in conduct meant to conceal. The only justified reason for allowing tolling under fraudulent concealment is that the plaintiff does not know about its cause of action before the statute of limitations runs and that the defendant caused that lack of knowledge. Defendant should be subject to an extended limitation period only when it took direct action to thwart plaintiff's effort to bring a claim. Silence, without some fiduciary duty, never satisfies this fraudulent-means element. King & King Enters., 657 F.2d at 1155; Rutledge, 576 F.2d at 250. Denial of wrongdoing, which can be expected of all wrongdoers, is also not sufficient to toll the statute. King & King Enters., 657 F.2d at 1155; Dayco Corp. v. Firestone Tire & Rubber Co., 386 F.Supp. 546, 549 (N.D.Ohio 1974), aff'd, 523 F.2d 389 (6th Cir.1975); but see Rutledge, 576 F.2d at 250 ("denying wrongdoing may constitute fraudulent concealment where the circumstances make the plaintiff's reliance upon the denial reasonable"). Plaintiff must prove that the defendant engaged in some conduct that is meant to conceal important facts from plaintiff.
 
 
 52
 Concealment of material facts, standing alone, may not be fraudulent concealment. The District of Columbia Circuit explained:
 
 
 53
 [T]he statute of limitation is not tolled whenever a defendant has concealed facts material to any legal issue of significance in a case. We do not provide for tolling simply because a plaintiff's ability to mount a successful case has been impaired in some degree. Instead, we provide for tolling only when concealment has so impaired the plaintiff's case that he is not able to survive a threshold motion to dismiss for failure to tender a claim that would advance beyond the pleading stage.
 
 
 54
 Hohri v. United States, 782 F.2d 227, 249 n. 57 (D.C.Cir.1986), vacated on other grounds, --- U.S. ----, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987). In other words, the facts concealed must be not only material, but they must also be relevant to a "critical element or defense attending [a] particular cause of action." Id. at 250. The crucial point is that a plaintiff should be given the opportunity to pursue a claim after the statutory limitation period has run only if it was unable to pursue the claim before the statutory period expired. If a plaintiff is led to believe that it has no cause of action or that the claim is subject to an iron-clad defense, then the concealment deprives the plaintiff of an opportunity to bring a timely action. Otherwise, plaintiff should pursue its claim before the statute runs. Only a concealment that makes it impossible for plaintiff to avoid dismissal for failure to state a claim supports a fraudulent concealment charge.
 
 
 55
 Fraudulent concealment also requires that the plaintiff be ignorant of the concealed facts. "The doctrine of equitable tolling is only available to toll the running of the statute of limitations during the period in which the potential defendants are concealing the cause of action from the potential plaintiff." Suslick v. Rothschild Sec. Corp., 741 F.2d 1000, 1005 (7th Cir.1984). Once a plaintiff actually learns the concealed facts, the statute begins to run. See id.; cf. Norton-Children's Hosps., Inc. v. James E. Smith & Sons, Inc., 658 F.2d 440, 443-44 (6th Cir.1981) (even when plaintiff discovers cause of action within four-year limitation period, statute is tolled until the discovery and runs as soon as plaintiff discovers the concealed facts). Furthermore, the plaintiff must prove that it lacked any reason to inquire into circumstances surrounding the claim. Hennegan v. Pacifico Creative Serv., Inc., 787 F.2d 1299, 1302 (9th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 279, 93 L.Ed.2d 254 (1986); Taylor, 712 F.2d at 1118 (concealment must "frustrate[ ] even diligent inquiry"). When a plaintiff who has had its suspicions aroused fails to investigate, "equity will impute to [it] knowledge of facts that would have been revealed by reasonably required further investigation." Wood v. Santa Barbara Chamber of Commerce, Inc., 705 F.2d 1515, 1521 (9th Cir.1983), cert. denied, 465 U.S. 1081, 104 S.Ct. 1446, 79 L.Ed.2d 765 (1984). Failure to investigate may result in a finding of no fraudulent concealment. Id.; Berkson, 743 F.2d at 56. Thus, to prove lack of knowledge plaintiff must show that it has no knowledge of the concealed facts and that it had no information that should have caused it to investigate and, in turn, uncover the claim.
 
 
 56
 In summary, a plaintiff seeking to avoid the statute of limitations by invoking fraudulent concealment must satisfy strict requirements. It must specifically plead and prove facts supporting all three required elements and, in doing so, must show that it was impossible for the plaintiff to maintain the cause of action before the statute had run. Fraudulent concealment has a place in the law, but as an ameliorative doctrine, its application should be limited to circumstances that led to its creation--namely, when defendant's actions foreclose any chance for plaintiff to bring its claim before the statutory limitation period expires.
 
 
 57
 Despite these requirements limiting the application of the doctrine, fraudulent concealment still presents a difficult analytical problem. Proving the alleged act of concealment is subject to the same problems of staleness and potential for unjustified claims as proving the primary cause of action. In some cases, the last claimed act of concealment may occur almost simultaneously with the acts claimed to constitute the Sherman Act violation. In fact, in the case at hand proof of the claimed concealment is essentially identical to proof of the claimed antitrust violation. In those instances, faded memory and lost evidence is as likely to produce an unjust or erroneous finding of concealment as such evidence is to produce a similar finding on the merits. As a result, permitting tolling for fraudulent concealment itself undermines the policy embodied in the statute of limitations: to insure against unreasonable hazard of inaccurate results derived from the unreliability of stale or lost evidence.[1] Therefore, courts must apply the tolling doctrine of fraudulent concealment with great care, recognizing that the tolling claim itself is fraught with potential for unjust and unwarranted establishment by stale and incomplete evidence.
 
 
 58
 C. Plaintiff State of Colorado's Fraudulent Concealment Claim
 
 
 59
 The district court held that plaintiff's claim was barred by the statute of limitations. This included a decision that plaintiff failed to present evidence to support its fraudulent concealment claim. More specifically, the district court found that plaintiff failed to present evidence showing that defendant used fraudulent means to conceal plaintiff's cause of action. The district court first required plaintiff to show affirmative acts of concealment to satisfy the fraudulent means element and then found that plaintiff presented no affirmative acts.[2] Plaintiff claims that this decision is erroneous because it showed affirmative acts and because proof of a self-concealing conspiracy can satisfy the fraudulent means element.
 
 1. Affirmative Acts of Concealment
 
 60
 In the district court, plaintiff asserted the following affirmative acts: (1) Larry Corn's submission of a false noncollusion affidavit in connection with the Newcastle project; (2) Western Paving's representative falsely denying any wrongdoing during a May 1982 interview; (3) Mr. Stillman's failure to disclose existence of the conspiracy to other employees of defendant; (4) defendant's submission of a complementary bid on the Newcastle project; and (5) Mr. Corn's preparation of the competitor list and making of telephone calls from a hotel room. The district court was correct in concluding that none of these acts should be considered affirmative acts of concealment.
 
 
 61
 "A denial of an accusation of wrongdoing does not constitute fraudulent concealment." King & King Enters., 657 F.2d at 1155 (quoting King & King Enters. v. Champlin Petroleum Co., 446 F.Supp. 906, 912 (E.D.Okla.1978)). A denial of wrongdoing can be expected of every wrongdoer as well as every innocent accused of wrongdoing. Thus, plaintiff should not be permitted to maintain its cause of action after the statute of limitations has run merely because defendant, or its alleged coconspirator, denied any wrongdoing. The same may be said of silence. "[I]n the absence of a fiduciary duty between the parties, mere failure to disclose the existence of a cause of action does not constitute fraudulent concealment." Id. (quoting King & King Enters., 446 F.Supp. at 912). No one who commits antitrust violations announces the violations to the potential plaintiffs. Thus, if silence were an affirmative act of concealment, every antitrust claim would be tolled until the plaintiff discovered what it asserts is evidence supporting its action. We refuse to adopt such a rule.
 
 
 62
 Three of the alleged affirmative acts of concealment were either a denial of wrongdoing or silence. Mr. Corn's submission of the noncollusion affidavit was no more than his denial of wrongdoing in preparing the Newcastle bid. Plaintiff's allegations state that defendant's representatives denied any wrongdoing when questioned during the 1982 interviews; even if the allegation is true, it claims nothing more than a denial of wrongdoing. Finally, Mr. Stillman's failure to disclose the existence of the conspiracy is at most silence. None of these three acts will support a fraudulent concealment claim.
 
 
 63
 The remaining acts were a part of the underlying conspiracy. If plaintiff's allegations are true and defendant and others engaged in a bidrigging conspiracy, then complementary bids were necessary. Furthermore, Mr. Corn's preparation of the competitor list would have been one step in carrying out that conspiracy. We agree with the district court that affirmative acts of concealment are "steps [taken] in addition to the original wrongdoing to prevent the plaintiff from discovering the wrong." Colorado ex rel. Woodard v. Western Paving Const. Co., 630 F.Supp. 206, 210 (D.Colo.1986) (emphasis added). Acts that are part of the original wrong, while they may conceal the wrong, are not acts of concealment; they are acts of perpetration. Consequently, plaintiff has shown no affirmative acts of concealment.
 
 2. Self-Concealing Conspiracy
 
 64
 Plaintiff also argues that proof of a self-concealing conspiracy satisfies the fraudulent means element. The district court rejected this argument, stating:
 
 
 65
 Plaintiff relies on dicta in King & King in which the Court discussed a Temporary Emergency Court of Appeals case in which that court stated that a defendant's conduct can sometimes be "inherently self-concealing," thus dispensing with the requirement of proof of affirmative acts of concealment. However, this dicta is directly contrary to the holding in King & King and the Court's statement that "[O]nce it appears that the statute of limitations has run, the plaintiff must sustain the burden of showing ... that some affirmative act of fraudulent concealment frustrated discovery notwithstanding [the plaintiff's] diligence."
 
 
 66
 Western Paving, 630 F.Supp. at 209 n. 3 (quoting King & King Enters., 657 F.2d at 1154-55). In King & King Enterprises, the affirmative acts of concealment--preparing a "talk/no talk" list and placing telephone calls after normal working hours--were also acts of perpetration. As Judge Anderson observes in his concurrence, the facts of King & King Enterprises do not require that the acts of concealment be independent of the underlying claim. Since the acts occurred contemporaneous with--rather than subsequent to--the original wrong, they could also support a self-concealing conspiracy theory. However, while requiring "some affirmative act" of concealment, the court never explicitly addressed the self-concealing argument. Thus, although King & King Enterprises does not by its language mandate acceptance of a self-concealing conspiracy argument, neither does it foreclose such an argument. The matter of self-concealment described as such is one of first impression in this court.
 
 
 67
 While no circuit court has reached the issue in antitrust claims, the District of Columbia Circuit has decided that a self-concealing conspiracy could toll the statute of limitations in a civil rights action. Hobson v. Wilson, 737 F.2d 1, 33-34 (D.C.Cir.1984), cert. denied, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). Two district court cases support plaintiff's claim. The court in F. Buddie Contracting, Inc. v. Seawright, 595 F.Supp. 422 (N.D.Ohio 1984), stated:
 
 
 68
 [T]he reason for tolling the statute of limitations [is] the plaintiff's ignorance of its claim because of the defendant's conduct. The statute of limitations exists for the purposes of barring stale conflicts. While the statute allows the defendant to repose after the passage of time, this policy is subsidiary to the policy that the plaintiff should have some opportunity to litigate his claim.
 
 
 69
 Id. at 428 (citation omitted). The court went on to state: "A self-concealing conspiracy, therefore, is the logical equivalent of affirmative acts which conceal a potential plaintiff's claim." Id. at 429. The court then allowed proof of a self-concealing conspiracy to support a fraudulent concealment claim.
 
 
 70
 The court in Bethlehem Steel Corp. v. Fischbach & Moore, Inc., 641 F.Supp. 271 (E.D.Pa.1986), reached the same conclusion. It stated:
 
 
 71
 [A] self-concealing conspiracy is the logical equivalent of affirmative acts which conceal a plaintiff's claim; in both instances, the plaintiff lacks the opportunity to bring the claim because of its inability to discover it.... I can see no reason to distinguish between situations where a conspiracy is self-concealing and where plaintiff alleges affirmative conduct by the defendant to conceal wrongdoing.
 
 
 72
 Id. at 274. The court then allowed tolling of the statute based on a self-concealing conspiracy argument.
 
 
 73
 The Ohio district court also recognized that its interpretation of fraudulent concealment could toll the statute of limitations indefinitely. However, it stated that requiring the plaintiff to plead and prove the other elements of fraudulent concealment would overcome this problem. F. Buddie Contracting, 595 F.Supp. at 429 n. 4; but see Pennsylvania v. Lake Asphalt & Petroleum Co., 610 F.Supp. 885, 888 (M.D.Pa.1985) (self-concealing conspiracy argument rejected because it would toll statute indefinitely).
 
 
 74
 None of these decisions, however, considers problems that may arise when stale evidence is used to show the self-concealing conspiracy. These problems influenced the district court's decision in this case.
 
 
 75
 This is a classic case in which the statute of limitations should be given effect. The facts forming the basis for plaintiff's claim occurred over 13 years prior to the filing of the complaint. The State's case is based almost entirely on the testimony of one witness, Larry Corn. His testimony cannot be corroborated because the only Western Paving employee with whom he "conspired," Harold Stillman, is now deceased. Both parties admit that many, if not all, of the relevant documents, including the noncollusion affidavits, bid proposals and other documents relating to the bidding process, have been destroyed pursuant to normal record retention policies.
 
 
 76
 Western Paving, 630 F.Supp. at 210-11 (footnote omitted). Without question, acceptance of a self-concealing conspiracy argument could exacerbate the stale evidence problem by permitting proof of the conspiracy after such proof was so stale as to be completely unreliable.
 
 
 77
 On the other hand, King & King Enterprises demonstrates that requiring affirmative acts of concealment does not avoid the stale evidence problem. Since the affirmative acts of concealment in King & King Enterprises occurred during, or shortly after, the alleged price fixing activities, proof of the acts of concealment would be as stale as proof of the underlying activity. Thus, while we cannot ignore the stale evidence problem, it is not sufficient, standing alone, to preclude use of a self-concealing conspiracy to support a fraudulent concealment claim.
 
 
 78
 Stale evidence is a problem because, after the statute of limitations has run, a defendant is subject to a greater risk of being required to answer on a claim after exculpatory evidence has been lost or destroyed. At that point, defendant bears a greater risk of an erroneous decision. Ancient chancery courts faced a similar situation. They "faced claims that were unenforceable at law because of the Statute of Wills, the Statute of Frauds, or the parol evidence rule. Concerned that claims would be fabricated, [they] imposed a more demanding standard of proof." Herman & MacLean v. Huddleston, 459 U.S. 375, 388 n. 27, 103 S.Ct. 683, 690 n. 27, 74 L.Ed.2d 548 (1983) (citation omitted). In fact, the very purpose served by the standard of proof is
 
 
 79
 to allocate between the litigants the risk of erroneous decision. When the standard applied is a mere preponderance of the evidence, the litigants share the risk of error in roughly equal proportion. If a substantial individual interest is at stake, a portion of the risk of erroneous decision-making is shifted away from the individual through application of the clear and convincing standard.
 
 
 80
 SEC v. First Fin. Group, 645 F.2d 429, 434 (5th Cir. Unit A May 1981) (citing Addington v. Texas, 441 U.S. 418, 423, 99 S.Ct. 1804, 1807, 60 L.Ed.2d 323 (1979)); see also Disner v. Westinghouse Elec. Corp., 726 F.2d 1106, 1111 (6th Cir.1984) (clear-and-convincing-evidence standard "guards against risk of error"). Thus, a higher standard of proof can shift the risk of error from defendant to plaintiff and alleviate the very problem created by stale evidence.
 
 
 81
 A higher standard of proof is appropriate for proof of a self-concealing conspiracy argument. The higher standard reflects a decision that the status quo is preferable to any change, and thus the party seeking change should bear "most, though not all, the risk of erroneous decision[s]." Colorado v. New Mexico, 467 U.S. 310, 316, 104 S.Ct. 2433, 2438, 81 L.Ed.2d 247 (1984). A plaintiff seeking to invoke fraudulent concealment is bringing its action after the statute of limitations has run. Acceptance of the fraudulent concealment argument will result in a tolling of the statute. Given the importance of statutes of limitations, courts should avoid tolling them except in limited situations. Increasing the burden on the party seeking to toll the statute will help to preserve the status quo. This argument is most compelling when the fraudulent concealment claim is based on a self-concealing conspiracy. Because the plaintiff rests its fraudulent concealment claim on evidence as stale and unreliable as evidence supporting the conspiracy claim, tolling the statute revives the very risk that the statute of limitations was enacted to prevent. Thus, some mechanism is needed to shift that risk back to the plaintiff. The higher standard of proof accomplishes that purpose.
 
 
 82
 The nature of a fraudulent concealment claim also supports a higher standard of proof. In Bailey, the Supreme Court decided that a litigant should not be allowed to commit a fraud--conceal plaintiff's cause of action--and then make that fraud "successful and secure" by pleading a provision of the law designed to prevent fraud--statutes of limitations. Bailey v. Glover, 88 U.S. (21 Wall.) at 349. To avoid that anomaly, the Court adopted the fraudulent concealment tolling doctrine. The basis for the doctrine was fraud. While it has been expanded to include activities that are not within the general definition of fraud, the courts have retained some of the similarities. For instance, a party seeking to invoke fraudulent concealment must plead the facts giving rise to the claim with specificity and particularity, the same requirement as fraud pleadings. We now carry the analogy one step further. Not only do the fraud pleading requirements apply, but the fraud standard of proof--clear and convincing evidence--also applies to fraudulent concealment when the fraud is a self-concealing conspiracy.
 
 
 83
 We, therefore, conclude that plaintiff, in its attempt to escape the statute of limitations, should be permitted to base its fraudulent concealment claim on proof of a selfconcealing conspiracy. However, we hold that plaintiff must prove the existence of the conspiracy, the self-concealing nature of the conspiracy and defendant's participation in the conspiracy by clear and convincing evidence. In cases involving tolling based on a self-concealing theory, the proof of the merits and the proof of tolling are the same, and thus, in effect, the higher standard of proof applies both as to tolling and liability. In this manner plaintiff is permitted to maintain its claim but also bears most of the burden of an erroneous decision.
 
 
 84
 D. Plaintiff's Proof of Self-Concealing Conspiracy
 
 
 85
 The district court granted defendant's motion for summary judgment and denied plaintiff's motion for partial summary judgment. Plaintiff claims that the district court erred because defendant engaged in a bidrigging conspiracy, and the statute of limitations should be tolled under a fraudulent concealment analysis. The only element of fraudulent concealment at issue in this case is whether defendant used fraudulent means to conceal plaintiff's cause of action. To prevail, plaintiff must prove by clear and convincing evidence that a bidrigging conspiracy existed, that the bidrigging conspiracy is a self-concealing conspiracy, and that defendant participated in the conspiracy. At the summary judgment level,
 
 
 86
 we must view the case in the same manner as did [the district court]. See Western Casualty & Surety Co. v. National Union Fire Ins. Co., 677 F.2d 789, 791 n. 1 (10th Cir.1982); Luckett v. Bethlehem Steel Corp., 618 F.2d 1373, 1377 (10th Cir.1980).... [W]e must determine whether any genuine issue of material fact exists and, if not, whether the substantive law was correctly applied. See Fed.R.Civ.P. 56(c); Western Casualty, supra. In doing so, we must view the record ... in the light most favorable to the party opposing the motion.
 
 
 87
 Gomez v. American Elec. Power Serv. Corp., 726 F.2d 649, 651 (10th Cir.1984). Thus, in deciding whether plaintiff is entitled to summary judgment on the statute of limitations issue, we must consider the evidence in the light most favorable to defendant. And in deciding whether defendant is entitled to summary judgment, we must consider the evidence in the light most favorable to plaintiff.
 
 
 88
 The Supreme Court also stated that in considering a summary judgment motion, we must consider the evidence "through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, ---, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Consequently, in determining whether a genuine issue as to a material fact exists, we must decide whether the evidence is sufficient to put the fact in issue under a clear-and-convincing-evidence standard. Defendant is entitled to summary judgment if it can show that plaintiff has not presented evidence that a jury could find, under the higher standard of proof, supports a decision that defendant engaged in a self-concealing conspiracy. On the other hand, plaintiff is entitled to summary judgment only if it shows that existence of the conspiracy is established even under a clear-and-convincing-evidence standard.
 
 
 89
 Plaintiff's proof of the existence of the conspiracy is strong. In fact, defendant does not deny that a conspiracy existed but rather denies that it was involved in any conspiracy if it did exist. Mr. Corn testified that a bidrigging conspiracy existed on the Newcastle project and pleaded guilty to charges that he participated in that conspiracy. Even when he was unable to remember the details of the conspiracy, Mr. Corn was sure that such a conspiracy existed and that his company benefited from the bidrigging. Furthermore, Mr. Popejoy testified that he violated antitrust laws on the Lamar project. He decided to call all potential bidders on the project, and after finding that none was "interested," he submitted his bid without further reducing the bid amount. Mr. Popejoy also testified that he gave a complementary bid and received $10,000 compensation for that bid on the Parker Road project. While no direct evidence linked the bidrigging on the Newcastle project with the bidrigging on the Lamar and Parker Road projects, the nature of a bidrigging conspiracy would permit the jury to find that a complementary bid on the first project may be repaid on one of the later projects. This would support a finding of a conspiracy. Even applying a clear-and-convincing-evidence standard, plaintiff has presented sufficient evidence, if believed, to show existence of a conspiracy.
 
 
 90
 We now turn to the question of whether a bidrigging conspiracy is a self-concealing conspiracy. If a bidrigging conspiracy exists, it must remain concealed to be successful. Any knowledge of the conspiracy would lead plaintiff to seek action immediately and result in collapse of the conspiracy. Furthermore, unlike many conspiracies, a bidrigging conspiracy is likely to exist for an extended period of time. To be attractive to all bidders, the conspiracy must cover more than one job--or must provide some quid pro quo to the "losing" bidders. The very nature of a bidrigging conspiracy makes it likely that future bids will also be rigged. Mr. Corn testified that he told Mr. Stillman that "we ... would be willing to give him a future job. And he agreed and just said that we owed him one...." Deposition of Larry Wallace Corn, record, vol. 2, at 117. These additional bidrigging activities not only provide the compensation for one of the "losing" bidders in the original bid but also help to conceal the bidrigging activity on the other bids. Such subsequent fraudulent acts may in themselves amount to affirmative acts of concealment. See Blanchette v. Cataldo, 734 F.2d 869, 876 (1st Cir.1984). In any event they show that a bidrigging conspiracy, if it exists at all, is per se self-concealing. Plaintiff has, therefore, satisfied the requirement of presenting evidence which, if believed, proves the conspiracy was self-concealing.
 
 
 91
 Proof of defendant's participation is much more troubling. Defendant's representatives explicitly denied any participation in illegal activities, and the only party with whom Mr. Corn allegedly conspired, Harold Stillman, is dead and cannot testify. Thus, the only evidence of defendant's participation in the conspiracy was Mr. Corn's testimony. Mr. Corn testified that he contacted defendant and that Mr. Stillman agreed to go along with the bidrigging scheme. But he also testified that this was the only contact he had with defendant and that defendant never asked Corn Construction to submit a complementary bid in return for defendant's bid on the Newcastle project. This evidence does not satisfy plaintiff's burden of showing that defendant participated in the bidrigging scheme as a matter of law. In a similar manner, Mr. Popejoy's testimony does not provide such clear and convincing proof of defendant's participation in a bidrigging scheme that plaintiff is entitled to summary judgment. Mr. Popejoy's allegations relating to any conversation with Mr. Walters are denied by Mr. Walters, and Mr. Popejoy admitted that defendant never asked for a complementary bid from Popejoy Construction. A jury could decide that defendant never participated in any bidrigging scheme. Thus, plaintiff is not entitled to summary judgment, and we affirm the district court's decision denying that motion.
 
 
 92
 The more difficult question is whether defendant is entitled to summary judgment. To escape summary judgment for defendant, plaintiff must show that a genuine issue of material fact exists as to defendant's participation in a bidrigging conspiracy. Furthermore, the evidence must create that issue under a clear-and-convincing-evidence standard. Mr. Corn's testimony is reasonably clear. He specifically testified that he contacted Mr. Stillman, obtained Mr. Stillman's agreement to participate in the scheme and told Mr. Stillman Corn Construction's bid. Moreover, the bid tabulation shows that on the Newcastle project defendant did submit a bid higher than Corn Construction. In addition, Mr. Popejoy specifically recalled the conversation with Mr. Walters. While Mr. Walters denied the essence of the conversation, claiming that he told Mr. Popejoy that defendant was getting out of bidding on projects outside the Denver metropolitan area, defendant submitted a bid on the Lamar project. Submission of a bid when he claimed to be getting out of that type of project may undermine Mr. Walters' credibility.
 
 
 93
 Even under a clear-and-convincing-evidence standard a jury could infer that defendant agreed to join the conspiracy and participate in the bidrigging. Thus, we conclude that defendant has not shown at this stage that there is no genuine issue as to any material fact.
 
 III. Attorney's Fees
 
 94
 Defendant appeals the district court decision denying it attorney's fees. A decision on attorney's fees will be reversed only if the trial court abused its discretion. Schneider v. Dumbarton Developers, Inc., 767 F.2d 1007, 1017 (D.C.Cir.1985); Chevron, U.S.A., Inc. v. Hand, 763 F.2d 1184, 1187 (10th Cir.1985). Given our determination on the merits that plaintiff is entitled to tolling under the fraudulent concealment doctrine if it can prove a self-concealing conspiracy, plaintiff's claim was not frivolous. Accordingly, we conclude that the trial court did not abuse its discretion in denying defendant attorney's fees.
 
 
 95
 Accordingly, we REVERSE the granting of defendant's motion for summary judgment and REMAND for proceedings consistent with this opinion.
 
 
 96
 STEPHEN H. ANDERSON, Circuit Judge, concurring.
 
 
 97
 I concur in the result in this case because as a practical matter it is required by this court's opinion in King & King Enter. v. Champlin Petroleum Co., 657 F.2d 1147 (10th Cir.1981), cert. denied, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982).
 
 
 98
 I would not go so far as to adopt the self-concealing fraud concept. "Self-concealing" is too amorphous. I prefer to maintain the requirement that a plaintiff show affirmative acts of concealment, although I would allow such acts to be part of the substantive misdeed. The justification for tolling the statute of limitations when there are affirmative acts of concealment independent of the underlying cause of action applies equally to acts of concealment which are also part of the cause of action. The defendant is not permitted to be rewarded, nor the diligent plaintiff punished, by the defendant's successful design to frustrate discovery of the wrong until the statute bars redress.
 
 
 99
 However, the extent of this creeping judicial alteration of the statute must be recognized. Since conspiracies are secret by nature, our holding moves another step closer to eliminating any time bar for an undisclosed conspiracy, leaving only questions of the plaintiff's knowledge and diligence for activating the statute. See Hall v. E.I. DuPont DeNemours & Co., 312 F.Supp. 358 (E.D.N.Y.1970). The few arguments to the contrary are unpersuasive. See F. Buddie Contracting, Inc. v. Seawright, 595 F.Supp 422, 429 n. 4 (N.D.Ohio 1984). Surely Congress could have fashioned the statute to run from the time of discovery if it had so desired, and it is not likely that the statute as written was intended to be the exception to a judicial rule. Over 100 years have passed since the Supreme Court spoke the words supposedly validating the "self-concealing" fraud rule in Bailey v. Glover, 88 U.S. (21 Wall.) 342, 22 L.Ed. 636 (1875), with a significant lack of acceptance of that rule by lower courts. The fact that most courts have required independent affirmative acts of concealment,[1] when adoption of a self-concealing fraud rule would have eliminated most of their labors on the facts and disposed of or eliminated much of the litigation in this area, makes a powerful point, albeit by inference.
 
 
 100
 While ample justification exists for staying the statute in the face of defendants' calculated secrecy, it must be remembered that statutes of limitation are consciously arbitrary, and serve a social purpose by being so. All those considerations are the business of Congress, not the courts.
 
 
 101
 Adoption here of concealment in and of itself as the test for tolling, even when that concealment is coupled with intent and affirmative acts constituting a substantive wrong, still does not provide a satisfactory line of demarcation. Malefactors avoid consequences by seeking and keeping act, actor, or both secret. Such secrecy is, as it were, a "fraud" on the victim, whose recovery is stymied by an inability to know the act or discover the actor. Yet no one would venture that all statutes of limitation are or should be judicially amended to commence when the plaintiff at last discovers (after "due" diligence) that a wrong has been committed and by whom. Perhaps that is why most courts to date have adhered to the independent affirmative acts rule. That rule offers a test short of concealment in and of itself, i.e. it requires two separate wrongs: the underlying misdeed plus the further misdeed of the cover-up. That requirement of two wrongs also broadens the plaintiff's evidentiary burden when bringing an action after the statutory period, thus providing some additional protection to defendants faced with the necessity of defending a charge on stale evidence. In this case and King and King, the evidentiary base is narrowed to the substantive wrong. The balance is somewhat restored by the clear and convincing standard imposed by the majority, and I hope that trial courts are liberal in granting dispositive motions at any appropriate stage of the proceedings where it appears that a plaintiff's case cannot fairly clear that hurdle because of the passage of time.
 
 
 
 *
 Opinion vacated
 
 
 [1]
 Congress must have had some of these considerations in mind when it enacted the antitrust statute of limitations. In fact, questions arose in debates about the application of the statute in cases of conspiracy. The consistent reply was that in cases of fraud and conspiracy the statute would not run until the time of discovery. See, e.g., 101 Cong.Rec. 5129, 5130, 5132-33 (1955); Kansas City, Mo. v. Federal Pac. Elec. Co., 310 F.2d 271, 278-80 (8th Cir.) (analysis of the legislative history), cert. denied, 371 U.S. 912, 83 S.Ct. 256, 9 L.Ed.2d 171 (1962), 373 U.S. 914, 83 S.Ct. 1297, 10 L.Ed.2d 415 (1963). At that time, the doctrine of fraudulent concealment was a well-recognized tolling doctrine, and thus, as noted earlier, all circuit courts decided that it should apply in antitrust cases
 
 
 [2]
 Because the district court found that plaintiff had not satisfied the first element of the fraudulent concealment test, it did not reach the other elements. Colorado ex rel. Woodard v. Western Paving Const. Co., 630 F.Supp. 206, 211 n. 5 (D.Colo.1986). We likewise do not reach them; they are best left for an initial decision by the district court
 
 
 [1]
 See, e.g., Rutledge v. Boston Woven Hose and Rubber Co., 576 F.2d 248 (9th Cir.1978); City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir.1974); City of Philadelphia v. Nucero Corp., No. 86-3628, slip op. (E.D.Pa. March 17, 1987) ("[m]ost courts have required a showing of an affirmative act of concealment by the defendant that is independent of the underlying wrong."); Pennsylvania v. Lake Asphalt & Petroleum Co., 610 F.Supp. 885 (M.D.Pa.1985)